**Onofre T. SERRANO, Plaintiff–Appellant,**

v.

**S.W. FRANCIS, Defendant–Appellee.**

No. 01–57036.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 7, 2003.

Filed Sept. 26, 2003.

David E. Azar (argued), Los Angeles, CA, for the plaintiff-appellant.

Bill Lockyer, Attorney General of the State of California (on brief), Robert R. Anderson, Chief Assistant Attorney General (on brief), Paul D. Gifford, Senior Assistant Attorney General (on brief), Bar-bara Spiegel, Supervising Deputy Attorney General (on brief), and John F. Bazan, Deputy Attorney General (argued), Los Angeles, CA, for the defendant-appellee.

Before: ALDISERT,* TALLMAN, and RAWLINSON, Circuit Judges.

## OPINION

ALDISERT, Circuit Judge.

Onofre Tommy Serrano, a wheelchair-bound black[1] prison inmate, appeals the district court's adverse decisions in his 42 U.S.C. § 1983 action alleging that prison officials denied him due process and equal protection by refusing to allow him to present live witness testimony during a prison disciplinary hearing. First, we must decide whether the district court erred in dismissing Serrano's due process claim without leave to amend when it held that he could not, as a matter of law, plead a protected liberty interest—namely, the freedom from administrative segregation—that was affected by the denial of due process. Second, we must determine whether the district court improperly granted summary judgment on Serrano's equal protection claim in light of evidence presented as to whether a prison officer's decision to deny the requested witness testimony during his disciplinary hearing was racially motivated. In so doing, we hold that Officer S.W. Francis is entitled to qualified immunity as to the due process claim, but conclude that the district court erred in granting summary judgment on the equal protection claim because Serrano

---

* Ruggero J. Aldisert, Senior Circuit Judge, United States Court of Appeals for the Third Circuit, sitting by designation.

1. Appellant describes himself as "black," and we will do the same. *See, e.g.,* Appellant's Brief at 21–23.

raised a genuine issue of material fact as to Francis' motives.

## I.

## A.

On August 20, 1995, Appellant Onofre Serrano and other inmates at the California Institute for Men in Chino, California, were returning to their cells as part of the afternoon lockup. Serrano, who is partially paralyzed and utilizes a wheelchair, came in last from the yard with three other wheelchair-bound inmates.

Accounts differ as to what happened next. Correctional Officer Jones maintains that Serrano disobeyed his order to lockup and to surrender what appeared to be contraband on Serrano's lap. Officer Jones claims that when he attempted to retrieve the alleged contraband by physical force, Serrano struck him with a closed fist, and that Serrano fell out of his wheelchair during the ensuing tussle. For his part, Serrano maintains that the alleged contraband was, in reality, non-contraband cookies and cake from the prison canteen and that he merely covered his canteen items with his body to prevent Officer Jones from taking them. In addition to asserting that he could not have punched Officer Jones with a closed fist because he had an injured finger in a splint, he also claims that Officer Jones lifted him out of his wheelchair by his T-shirt, forcing them both to the ground.

As a result of the incident, Officer Jones filed a CDC–115 form charging Serrano with battery on staff. Because attacking a correctional officer is a serious, level "B" offense, Serrano was immediately placed in administrative segregation and sent to the Special Housing Unit ("SHU") pending adjudication of the charge. The SHU was not handicapped-accessible, and prison officials did not permit Serrano to have his wheelchair in the cell. Serrano alleges that he had to crawl into his bunk, hoist himself onto the toilet by the toilet seat, avoid the shower because the facility lacked an appropriate shower seat, and sit idle for outdoor exercise because the outdoor yard was not handicapped-accessible. He also alleges that the SHU was infested with cockroaches and vermin.

Because he was in administrative segregation and thus unable to conduct his own investigation, Serrano was assigned an investigative employee, Officer Padilla, who would take brief statements from witnesses to the altercation. Padilla's report included statements by four inmates, two of whom were mentioned in Officer Jones' initial report. Serrano believed that he would be able to call the witnesses during his hearing.

At the September 17, 1995 hearing on the CDC–115, Serrano asked if he could present live testimony from the four inmates and from Padilla. Appellee Correctional Lieutenant S.W. Francis, however, permitted live testimony only from Serrano and Officer Jones. Serrano alleges that Francis told him that he was "not going to rally your Crip[ple] buddies for this hearing."[2] Appellee's SER Ex. 18 at 51 ¶ 19. According to Serrano, when Serrano asserted his right to call and have witnesses present live testimony, Francis scoffed at him and noted that he had their testimony in the form of Officer Padilla's report. After Francis began to read the allegations from the CDC–115, Serrano—who is black—allegedly said, "Come on, I wouldn't think of hitting a white officer, do you think that I would do something that stupid, especially while I'm in a wheel-

---

**2.** We note that Serrano independently added the bracketed "[ple]" to the word "Crip" in his declaration in support of his statement of objections. We do not know whether Francis intended Serrano's suggested interpretation.

chair? I plead not guilty." Appellee's SER Ex. 18 at 52 ¶ 17. Francis allegedly replied, "I don't know how black people think, and I'll never know. I don't know why a guy would stab his wife and her friend to death."[3] *Id.*

After Serrano offered testimony about the altercation, Officer Jones gave his version of the events. Instead of allowing Serrano to question Officer Jones directly, Francis served as the intermediary. Francis would read Serrano's questions from Serrano's prepared notes and did not permit him to ask follow-up questions. After Serrano objected to the hearing as unconstitutional, Francis allegedly responded that "he was treating [Serrano] like all the rest ... and that [Serrano] was 'not O.J. Simpson or Johnnie Cochran.'" Appellee's SER Ex. 18 at 54 ¶ 19. Relying on the live testimony of Serrano and Officer Jones and Padilla's written investigative report, Francis found Serrano guilty of the battery charge, assessing him a 12–month SHU term[4] and a 150 day credit forfeiture. Francis offered no written explanation of why he refused Serrano's demand to call witnesses to give live testimony.

Serrano appealed the disciplinary findings and sanction. On June 21, 1996, Serrano's appeal was partially granted because Francis had failed to provide a written explanation of why he refused Serrano's request for live witness testimony, and the institution was ordered to vacate the original CDC–115 disposition and reissue and rehear the disciplinary charge.

Serrano had a new hearing on November 2, 1996. Relying on Serrano's testimony and documents and written testimony from the first hearing, a new hearing examiner found Serrano guilty of the lesser offense of resisting staff, a class "D" offense. The hearing officer concluded that Serrano could not have punched Jones, as alleged, because Serrano had an injured finger in a splint at the time of the altercation. Accordingly, the hearing officer assessed a 90–day loss of privileges.

Serrano appealed the new disciplinary decision. The appeal was ultimately granted and the CDC–115 misconduct charge dismissed because the second hearing was not held within court-mandated time limits. The winning appeal restored his credits and his classification score to its level before the altercation.

**B.**

On December 4, 1996, Serrano filed a *pro se* complaint under 42 U.S.C. § 1983 against Francis, alleging due process and equal protection claims. The case was referred to a magistrate judge on December 11, 1996, who dismissed the case with leave to amend on December 23, 1996. Serrano filed his First Amended Complaint on January 21, 1997, which the magistrate judge dismissed with leave to amend on December 12, 1997.

On March 17, 1997, Serrano filed his Second Amended Complaint. On August 8, 1997, Francis moved to dismiss, and Serrano filed his opposition on September 4, 1997. On October 9, 1997, the magistrate judge issued a Report and Recommendation suggesting: (a) that Serrano's due process claim be dismissed without leave to amend because he could not establish a protected liberty interest in not being placed in administrative segregation, in his classification status or in his loss of privileges; and (b) that Serrano's equal

---

**3.** At the time of the hearing in September 1995, the murder trial of O.J. Simpson was in full swing—involving the murders to which Francis was apparently alluding.

**4.** Serrano was placed in administrative segregation from August 20, 1995 to October 11, 1995, when his sentence was suspended and he was transferred to another prison.

protection claim be dismissed with leave to amend. On November 12, 1997, the district court adopted in full the magistrate judge's Report and Recommendation.

Serrano timely filed his Third Amended Complaint on December 11, 1997. Francis moved to dismiss on April 15, 1998, and Serrano filed his opposition on May 28, 1998, treating Francis' motion as one alternatively to dismiss or for summary judgment. The magistrate judge issued a Report and Recommendation on August 21, 1998, dismissing with prejudice Serrano's claim that Francis discriminated against him under a blanket policy of not allowing inmates in administrative segregation to call witnesses at disciplinary hearings, but permitting Serrano to file an amended complaint that Francis discriminated against him on the basis of race, physical disability, and/or his status as a jailhouse lawyer. The district court adopted the magistrate's Report and Recommendation on October 6, 1998, emphasizing in a minute order that Serrano could file an amended complaint on that "one limited issue."

Serrano filed his Fourth Amended Complaint on October 12, 1998. After a period of discovery, Francis filed a motion for summary judgment on August 12, 1999. Serrano countered with his own motion for partial summary judgment on August 24, 1999, and he filed his opposition to Francis' summary judgment motion on September 13, 1999. On January 3, 2000, the magistrate judge denied Serrano's motion for partial summary judgment and terminated the case. Serrano filed a petition for relief before this Court on June 6, 2000, which was denied eight days later.

On June 22, 2001, Serrano filed a motion for a pre-trial conference, a jury trial, and an order to permit him to be present at trial. The case was reassigned on July 2, 2001 to another magistrate judge, who reopened the case on August 1, 2001 after having found that the first magistrate judge had erroneously closed it. On August 15, 2001, the new magistrate judge issued a Report and Recommendation that Francis' motion for summary judgment be granted and that the case be dismissed. On October 4, 2001, Serrano filed his opposition to the Report and Recommendation in which he provided a detailed declaration regarding how Francis conducted the disciplinary hearing and what he had allegedly said during it. The district court adopted the Report and Recommendation and entered judgment on October 19, 2001, granting Francis' motion for summary judgment.

Serrano filed a timely Notice of Appeal on November 5, 2001. Serrano accepted appointed pro bono counsel on January 7, 2003.

Our task is to review the dismissal of the due process claim under Federal Rule of Civil Procedure 12(b)(6) and the summary judgment entered on the equal protection claim.

### C.

The United States District Court for the Central District of California had jurisdiction in the underlying action pursuant to 28 U.S.C. § 1331 based on Appellant's claims under 42 U.S.C. § 1983. Moreover, the court had jurisdiction pursuant to 28 U.S.C. § 1343 over Appellant's civil rights claims under 42 U.S.C. § 1983. This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291.

### II.

### A.

Although it may seem premature to address Francis' qualified immunity defense before the district court has even ruled on it, we do so here because this court may affirm on any ground supported

by the record. *Matus–Leva v. United States*, 287 F.3d 758, 760 (9th Cir.2002). Accordingly, although the district court used a motion to dismiss to dispose of the due process portion of the case, we shall determine *de novo* whether the district court could have reached the same result via Francis' qualified immunity defense—a defense that was properly raised in his initial answer. *See Robinson v. Prunty*, 249 F.3d 862, 865–866 (9th Cir.2001) ("We review de novo the district court's determination regarding qualified immunity.") (citation omitted).[5]

## B.

Government officials who perform discretionary functions generally are entitled to qualified immunity from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (citations omitted).

■ The initial inquiry is whether the alleged facts show that the defendant violated the plaintiff's constitutional rights. *Saucier v. Katz*, 533 U.S. 194, 201–202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). If the allegations show that the defendant indeed violated the plaintiff's constitutional rights, the second inquiry is whether the law at the time of the alleged constitutional violation was clearly established. *Id.* at 201–202, 121 S.Ct. 2151. That is to say, "the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v.*

*Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). To determine that the law was clearly established, we need not look to a case with identical or even "materially similar" facts. *Hope v. Pelzer*, 536 U.S. 730, 739–741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002); *Flores v. Morgan Hill Unified Sch. Dist.*, 324 F.3d 1130, 1136–1137 (9th Cir.2003). Rather, the "standard is one of fair warning: where the contours of the right have been defined with sufficient specificity that a state official had fair warning that [his] conduct deprived a victim of his rights, [he] is not entitled to qualified immunity." *Haugen v. Brosseau*, 339 F.3d 857, 873, 2003 U.S.App. LEXIS 15517, at *42 (9th Cir. Aug. 4, 2003) (citation omitted); *see also Pelzer*, 536 U.S. at 740 n. 10, 122 S.Ct. 2508 ("The object of the 'clearly established' immunity standard is not different from that of 'fair warning' . . . .") (citation and alteration omitted).

If a genuine issue of material fact exists that prevents a determination of qualified immunity at summary judgment, the case must proceed to trial. *Roth v. Veteran's Admin.*, 856 F.2d 1401, 1408–1410 (9th Cir.1988).

## C.

### 1.

■ Under the Fourteenth Amendment's Due Process Clause, a prisoner is entitled to certain due process protections when he is charged with a disciplinary violation. *Wolff v. McDonnell*, 418 U.S. 539, 564–571, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). Such protections include the rights to call witnesses, to present documentary evidence and to have a written statement by the factfinder as to the evi-

**5.** We would, in any event, apply a *de novo* standard of review to a district court's decision to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). *Stone v. Travelers Corp.*, 58 F.3d 434, 436–437 (9th Cir.1995).

dence relied upon and the reasons for the disciplinary action taken. *Id.*

These healthy procedural protections, however, adhere only when the disciplinary action implicates a protected liberty interest in some "unexpected matter" or imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Connor,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995); *see also Ramirez v. Galaza,* 334 F.3d 850, 860 (2003) ("If the hardship is sufficiently significant, then the court must determine whether the procedures used to deprive that liberty satisfied Due Process.") (citations omitted). The Supreme Court has identified few protected liberty interests. *See, e.g., Vitek v. Jones,* 445 U.S. 480, 493, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980) (identifying the freedom from transfer to a mental hospital as a protected liberty interest); *Washington v. Harper,* 494 U.S. 210, 221 222, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990) (identifying the freedom from the involuntary administration of psychotropic drugs as a protected liberty interest).

■ Rather than invoking a single standard for determining whether a prison hardship is atypical and significant, we rely on a "condition or combination of conditions or factors [that] requires case by case, fact by fact consideration." *Keenan v. Hall,* 83 F.3d 1083, 1089 (9th Cir.1996). Specifically, we look to three guideposts by which to frame the inquiry: (1) whether the challenged condition "mirrored those conditions imposed upon inmates in administrative segregation and protective custody," and thus comported with the prison's discretionary authority; (2) the duration of the condition, and the degree of restraint imposed; and (3) whether the state's action will invariably affect the duration of the prisoner's sentence. *Sandin,* 515 U.S. at 486–487, 115 S.Ct. 2293; *Keenan,* 83 F.3d at 1089.

■ Typically, administrative segregation in and of itself does not implicate a protected liberty interest. *See, e.g., Sandin,* 515 U.S. at 486, 115 S.Ct. 2293 ("[D]isciplinary segregation, with insignificant exceptions, mirror[s] those conditions imposed upon inmates in administrative segregation and protective custody."); *Resnick v. Hayes,* 213 F.3d 443, 449 (9th Cir.2000) (holding that the pre-sentencing prisoner had no liberty interest in being free from administrative segregation); *accord Wagner v. Hanks,* 128 F.3d 1173, 1174 (7th Cir.1997) ("But it would be difficult (we do not say impossible) to make disciplinary segregation sufficiently more restrictive than the conditions of the general population ... to count as an atypical and significant deprivation of liberty[.]"); *Freitas v. Ault,* 109 F.3d 1335, 1337 (8th Cir.1997) ("We believe that as a matter of law these conditions of [standard administrative segregation] do not constitute an 'atypical and significant' hardship, ... when compared to the burdens of ordinary prison life.") (internal citation omitted).

Serrano wallowed in a non-handicapped-accessible SHU for nearly two months—25 days of which immediately followed Francis' sentencing Serrano to a year-long term in the SHU. During his time in the facility, Serrano was denied use of his wheelchair, which he was permitted to use in the general population. Serrano has alleged that he could not take a proper shower; that he could not use the toilet without hoisting himself up by the seat; that he had to crawl into bed by his arms; that he could not partake in outdoor exercise in the yard; and that he was forced to drag himself around a vermin and cockroach-infested floor.

■ We have before us a novel situation. In the case at bar, it is not Serrano's administrative segregation alone that potentially implicates a protected liberty in-

terest. Instead, Serrano's disability—coupled with administrative segregation in an SHU that was not designed for disabled persons—gives rise to a protected liberty interest. That is, the conditions imposed on Serrano in the SHU, by virtue of his disability, constituted an atypical and significant hardship on him.[6]

Although it is an understandable standard procedure to take an assistance device away from an inmate placed in administrative segregation "[b]ecause ... [t]he material of the [device] can be taken apart to be used as weapons or made into weapons," Deposition of Correctional Lieutenant Thomas Diaz, Appellant's SER at 216, the placement of a wheelchair-reliant inmate into an unequipped administrative segregation facility worked an atypical and significant hardship on Serrano in relation to the ordinary incidents of prison life. The removal of his wheelchair dropped him from the relative baseline status that he maintained outside administrative segregation and forced him to endure a situation far worse than a non-disabled prisoner sent to the SHU would have to face. Accordingly, the conditions of his SHU confinement "work[ed] a major disruption in his environment" and ceased to mirror those conditions imposed upon inmates in administrative segregation and protective custody. *Sandin*, 515 U.S. at 486, 115 S.Ct. 2293.

Having determined that Serrano identified a protected liberty interest in his being free from confinement in a non-handicapped-accessible administrative housing unit, we now turn to the question of whether Serrano was given his procedural process due.

2.

■ Prisoners do not check all of their constitutional rights at the jailhouse gate. Indeed, they "may ... claim the protections of the Due Process Clause[, and they] may not be deprived of life, liberty or property without due process of law." *Wolff*, 418 U.S. at 556, 94 S.Ct. 2963 (citations omitted). Embedded in this concept is the principle that "the inmate facing disciplinary proceedings should be allowed to call witnesses ... in his defense when permitting him to do so would not be unduly hazardous to institutional safety or correctional goals." *Id.* at 566, 94 S.Ct. 2963. Jail officials need not provide inmates an unfettered right to call witnesses, but they must make the decision whether to allow witnesses on a case-by-case basis, examining the potential hazards that may result from calling a particular person. *Mitchell v. Dupnik*, 75 F.3d 517, 525 (9th Cir.1995). "[A] blanket denial of permission for an inmate to have witnesses physically present during disciplinary hearings is impermissible, even where jail authorities provide for interviewing of witnesses outside the disciplinary procedure." *Id.*

■ Although Francis fully concedes that he did not permit Serrano to call live witnesses during the hearing, he contends that a state regulation specifically authorized him to refuse an inmate's request for live witness testimony. The regulation provides that "[r]equested witnesses shall be called unless the official conducting the hearing denies the request[because] [t]he appearance would endanger the witness[;][t]he official determines that the witness has no relevant additional informa-

---

**6.** Although individuals with disabilities do not qualify as a "suspect class" of persons under the Equal Protection Clause of the Fourteenth Amendment, *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 446, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985), that classification or lack thereof is immaterial to our analysis here.

Our inquiry is limited to whether the disciplinary action implicates a protected liberty interest in some "unexpected matter" or imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 483–484, 115 S.Ct. 2293.

tion[;][or][t]he witness is unavailable." CAL. CODE REGS. tit. 15 § 3315(e)(1). He therefore argues that any live witness testimony following the admission into evidence of Officer Padilla's investigative interviews with the inmates whom Serrano wished to call would have been redundant; in the words of the regulation, the witnesses would have offered "no relevant additional information." *Id.*

After characterizing a regulation that imbues a prisoner with positive rights into a restrictive one, Francis neglects to mention that state regulations also require the hearing official to document the reasons for the refusal if the inmate's request for a witness is denied. CAL. CODE REGS. tit. 15 § 3315(e)(2). Indeed, Francis' failure to do so was precisely the reason why Serrano's charge and punishment were later vacated and why Serrano was removed from administrative segregation.

Given the facts that the hearing ultimately implicated a protected liberty interest and that Francis offered no reason for refusing to allow live witness testimony on Serrano's behalf, we conclude that Francis violated Serrano's right to call witnesses in his defense.

Accordingly, we now move to our analysis of qualified immunity.

### 3.

In determining whether Francis is entitled to qualified immunity on Serrano's due process claim, we begin by addressing the first prong of the *Saucier* test—whether plaintiff has alleged facts showing that Francis violated Serrano's due process

right to call witnesses on his own behalf at the disciplinary hearing.[7]

As we discussed above, Serrano has alleged both that he possesses a protected liberty interest in his being free from restraint in a unit that is not designed for disabled persons and that Francis violated his constitutional right to have live witness testimony at the hearing. Accordingly, he has checked off the list both components of his claim for the purposes of the first prong of the qualified immunity analysis.

### 4.

Thus, we proceed to the second *Saucier* prong—the "purely legal" issue of whether the law at the time of the alleged constitutional violation was clearly established. *Biggs v. Best, Best & Krieger*, 189 F.3d 989, 993 (9th Cir.1999). We conclude that it was not.

Although it is certainly clearly established that "the inmate facing disciplinary proceedings should be allowed to call witnesses ... in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals[,]" *Wolff*, 418 U.S. at 566, 94 S.Ct. 2963, this court has never before addressed the contours of the initial component of Serrano's claim—whether a disabled inmate's freedom from restraint in a facility that is not designed for disabled persons may, as a matter of law, constitute a protected liberty interest.

The second prong of the *Saucier* test is a "fair warning" mechanism designed to exempt from liability those officials who

7. Although we note that Francis himself was not directly responsible for the conditions in the SHU, the gravamen of Serrano's complaint revolves around his procedural due process claim that Francis violated his constitutional right to present live witness testimony. In order to delve deeply into the procedural core in this type of complaint, an

inmate must first mine the surface to establish that he possessed a protected liberty interest in being free from the particular punishment resulting from the hearing. But we need not address what essentially amounts to a proximate cause issue because we resolve Francis' liability through this qualified immunity analysis.

commit a constitutional violation that a reasonable official would not believe is contrary to law. *Haugen*, 339 F.3d at 873, 2003 U.S.App. LEXIS 15517, at *42.

■ With regard to the conditions of administrative segregation for disabled inmates, the contours of the protected liberty interest have not been determined with sufficient specificity that Francis had fair warning that his levying of the punishment via failing to allow live witness testimony would deprive Serrano of his constitutional right to be free from this type of restraint. *Id.* Although we need not look to a case with identical or even "materially similar" facts to determine whether Francis had fair warning, *Hope*, 536 U.S. at 739–741, 122 S.Ct. 2508; *Flores*, 324 F.3d at 1136–1137, we note that *no* case in this circuit touches on the proper conditions for the liberty interest rights of disabled inmates in administrative segregation. We have discussed disabled inmates' rights in the context of Eighth Amendment claims. *See Frost v. Agnos*, 152 F.3d 1124, 1129–1130 (9th Cir.1998) (reversing summary judgment where prison officials were aware that a disabled pretrial detainee who used crutches had fallen and injured himself on a slippery shower floor, but where the officials declined to take reasonable measures to help him shower safely); *accord LaFaut v. Smith*, 834 F.2d 389, 392–394 (4th Cir.1987) (finding that the failure of prison officials to ensure that mobility-impaired inmates had accessible toilet facilities resulted in the violation of a prisoner's constitutional rights). And the Supreme Court has discussed disabled inmates' rights in the context of Americans with Disabilities Act claims. *Pennsylvania Dep't of Corrs. v. Yeskey*, 524 U.S. 206, 213, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998) (holding that Title II of the Americans with Disabilities Act applies to prisons).

But we have never discussed disabled inmates' rights in the context of claims involving protected liberty interests. The protected liberty interest analysis does not match that of an Eighth Amendment analysis. *See Keenan*, 83 F.3d at 1089 ("We do not suggest ... that the [atypical and significant hardship test] is synonymous with [an] Eighth Amendment violation."). By extension, a claim under the ADA would also involve a completely separate analysis and standard.

Moreover, administrative segregation following a hearing at which a constitutional violation was committed is a different beast altogether—so different, in fact, that the Supreme Court fashioned a unique substantive-to-procedural analysis for the scenario. Although we note that the prison failed miserably in providing adequate facilities for the disabled Serrano during his spell in solitary confinement, we cannot hold Francis liable for a constitutional violation, the contours of which had never before been fleshed out. Those contours are fleshed out as of today. Accordingly, although we find deplorable the conditions under which Serrano was kept following Francis' decision, we will affirm the dismissal of the due process claim under Federal Rule of Civil Procedure 12(b)(6) on the basis of qualified immunity.

## III.

### A.

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *Cleburne*, 473 U.S. at 439, 105 S.Ct. 3249 (citation omitted). "Prisoners are protected under the Equal Protection Clause ... from invidious discrimina-

tion based on race." *Wolff,* 418 at 556, 94 S.Ct. 2963. To state a claim for violation of the Equal Protection Clause, a plaintiff must show that the defendant acted with an intent or purpose to discriminate against him based upon his membership in a protected class. *Barren v. Harrington,* 152 F.3d 1193, 1194 (9th Cir.1998). "Intentional discrimination means that a defendant acted at least in part *because of* a plaintiff's protected status." *Maynard v. City of San Jose,* 37 F.3d 1396, 1404 (9th Cir.1994) (emphasis in original) (citation omitted). To avoid summary judgment, Serrano "must produce evidence sufficient to permit a reasonable trier of fact to find by a preponderance of the evidence that the decision was racially motivated." *Bingham v. City of Manhattan Beach,* 329 F.3d 723, 732 (9th Cir.2003) (citations and alterations omitted).

"A grant of summary judgment is reviewed *de novo.*" *Oliver v. Keller,* 289 F.3d 623, 626 (9th Cir.2002) (citation omitted). "Viewing the evidence in the light most favorable to the nonmoving party, we must determine whether there are genuine issues of material fact and whether the district court correctly applied the substantive law." *Id.* (citation omitted).

### B.

On August 21, 1998, the new magistrate judge issued her Report and Recommendation suggesting that Serrano did not produce sufficient evidence to permit a reasonable trier of fact to find by a preponderance of the evidence that Francis' decision not to permit live testimony was racially motivated. Specifically, the new magistrate judge concluded that because Francis had legitimate reasons for refusing to summon the four inmate witnesses and IE Officer Padilla to the hearing to give live testimony and because Francis was acting in accordance with state regulations governing the adjudication of serious rule violations, a reasonable jury could not return a verdict for Serrano. Appellant's SER Ex. 7.

Although the magistrate judge issued her Report and Recommendation without the benefit of having read Serrano's specific allegations of Francis' racial bias at the hearing, Serrano managed to include those allegations in a supplemental declaration in opposition to the magistrate judge's report—a declaration that the district court may consider when reviewing a magistrate judge's Report and Recommendation. *See* 28 U.S.C. 636(b)(1)(C) ("[T]he magistrate shall file [her] proposed findings and recommendations ... with the court[.] ... Within ten days after being served with a copy, any party may serve and file written objections to such proposed findings and recommendations as provided by rules of[the] court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made.").

Specifically, after Francis began to read the allegations from the CDC–115 form, Serrano allegedly said, "Come on, I wouldn't think of hitting a white officer, do you think that I would do something that stupid, especially while I'm in a wheelchair? I plead not guilty." Appellee's SER Ex. 18 at 52 ¶ 17. Francis allegedly replied, "I don't know how black people think, and I'll never know. I don't know why a guy would stab his wife and her friend to death." *Id.* He also allegedly told Serrano that "he was treating [Serrano] like all the rest ... and that [Serrano] was 'not O.J. Simpson or Johnnie Cochran.'" Appellee's SER Ex. 18 at 54 ¶ 19. Notwithstanding the facts alleged in the supplemental allegation, the district court accepted the magistrate judge's Report and Recommendation whole hog on October 19, 2001.

### C.

 We disagree with the district court and conclude Serrano has alleged sufficient facts to convince a reasonable trier of fact by a preponderance of the evidence that the decision not to allow live witness testimony was racially motivated. Although Francis' racial remarks came directly in response to Serrano's own infusion of race into the hearing, the fact remains that Serrano alleged that Francis made specific, racially tinged remarks during the hearing—specifically, that Francis "[didn't] know how black people think" and that he said that "he was treating [Serrano] like all the rest . . . and that [Serrano] was 'not O.J. Simpson or Johnnie Cochran.'" Accordingly, Serrano has not "failed to produce any evidence of discriminatory intent, [and indeed] he has . . . created a genuine issue of material fact as to whether [Francis'] actions violated the Equal Protection Clause." *Bingham*, 329 F.3d at 732.

Although we certainly do not condone Francis' alleged comments, Serrano clearly introduced the issue of race at the hearing. A prison officer should take great pains to appear—and indeed to be—impartial during the resolution of a disciplinary hearing. Not only should the officer refrain from making the sorts of remarks that Francis allegedly did, but he or she should resist the urge to make racial comments at all—lest inmates use this technique to establish claims for equal protection under a pleading standard for constitutional torts that is no longer heightened as to motive. *Crawford–El v. Britton*, 523 U.S. 574, 595, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998); *Galbraith v. County of Santa Clara*, 307 F.3d 1119, 1125–1126 (9th Cir.2002).

We conclude that Serrano has made sufficient allegations to show a genuine issue of material fact with regard to Francis' motives. Accordingly, we reverse the district court's decision to grant summary judgment on Serrano's equal protection claim.

### IV.

We AFFIRM the district court's dismissal of Serrano's due process claim under Federal Rule of Civil Procedure 12(b)(6), but we do so on the alternate ground that Francis is entitled to qualified immunity. We REVERSE the district court's decision to grant summary judgment as to Serrano's equal protection claim because Serrano has alleged sufficient facts to convince a reasonable trier of fact by a preponderance of the evidence that Francis refused to allow him to call live witnesses because of Serrano's race.