# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

December 17, 2014

Lyle W. Cayce
Clerk

No. 13-31289

ROBERT KING WILKERSON; ALBERT WOODFOX; VICTORY WALLACE; BARBARA WALLACE MARSHALL; LORRAINA WALLACE ANDERSON; JUSTINA WALLACE WILLIAMS,

Plaintiffs - Appellees

v.

JERRY GOODWIN, Warden, David Wade Correctional Center, in his official and individual capacity; JAMES ARNOLD, Deputy Warden of Security, David Wade Correctional Center, in his official and individual capacities; LONNIE NAIL, Lieutenant Colonel, David Wade Correctional Center, in his official and individual capacities; MARK HUNTER, Classification Officer, David Wade Correctional Center, in his official and individual capacities; HOWARD PRINCE, Warden, Elayn Hunt Correctional Center, in his official and individual capacities; GREG MCKEY, Assistant Warden of Security, Elayn Hunt Correctional Center, in his official and individual capacities; BETTY JOHNSON, Lieutenant Colonel, Elayn Hunt Correctional Center, in her official and individual capacities; KEVIN DURBIN, Lieutenant Colonel, Elayn Hunt Correctional Center, in his official and individual capacities; JEFFREY GLADNEY, Classification Officer, Elayn Hunt Correctional Center, in his official and individual capacities; CHRIS EVANS,

Defendants - Appellants

Appeal from the United States District Court
for the Middle District of Louisiana

Before KING, GRAVES, and HIGGINSON, Circuit Judges.

JAMES E. GRAVES, JR., Circuit Judge:

No. 13-31289

Plaintiff-Appellee Albert Woodfox asserts a Fourteenth Amendment procedural due process claim against various prison officials at the David Wade Correctional Facility ("Wade") in Louisiana, arising out of his lengthy and continuing incarceration in solitary confinement. The district court denied the defendant prison officials' motion for summary judgment based on qualified immunity. We affirm.

## I. Factual and Procedural Background

Plaintiff Albert Woodfox asserts that his solitary confinement, which has now lasted nearly thirty-nine years, persists indefinitely without justification and without adequate procedural protections, in violation of the constitutional guarantee of due process. Woodfox and his previous co-plaintiff, Herman Wallace, were originally placed in closed-cell restriction ("CCR"), also referred to as "extended lockdown," in the Louisiana State Penitentiary at Angola ("LSP") in 1972 after they were suspected of the murder of corrections officer Brent Miller, a crime for which they were subsequently convicted. With the exception of a three-year transfer to a parish jail and a brief period in which he was housed in a dormitory setting at LSP, Woodfox has been held continually in CCR. He was transferred to CCR at Wade in November 2010, where he continues to be held.

The district court found, and the record supports, that CCR at both LSP and Wade is the effective equivalent of solitary confinement. The district court described the conditions in CCR as follows:

> Extended lockdown, also known as closed cell restrictions or administrative segregation, is a form of incarceration at LSP, Hunt, and Wade that is similar to solitary confinement. The prisoners thereto assigned remain alone in cells approximately 23 hours each day. During the other hour, a prisoner may shower and

2

walk along the tier in which his cell is located. Three times a week, the prisoner may use this hour to exercise alone in a fenced yard, if the weather permits. The prisoners in extended lockdown also face additional restrictions on privileges generally available to inmates such as personal property, reading materials, access to legal resources, work, and visitation rights. In contrast, inmates in the general prison population live in a dormitory setting where they can interact with one another, attend religious ceremonies and take advantage of educational opportunities, training, and other privileges denied to those in extended lockdown.

*Wilkerson v. Stalder (Wilkerson II)*, No. 3:00-CV-304, 2013 WL 6665452, at *2 n.5 (M.D. La. Dec. 17, 2013) (order denying summary judgment). The inmates in CCR appear before a review board every ninety days. Woodfox asserts that he receives inadequate "sham" reviews before the board. The district court reviewed the evidence submitted regarding the review boards and concluded that "the Plaintiffs' placement in CCR was and remains indefinite." *Id*. at *9.

When the summary judgment motion was decided in the district court and briefed in this court, Herman Wallace's due process claim against prison officials at the Elayn Hunt Correctional Facility ("Hunt") was still pending, asserted by his family after his death in October 2013.[1] Wallace was held in CCR at LSP and Hunt for over forty years. After oral argument, counsel informed us that Wallace's claims against the Hunt officials have now been settled and dismissed, and thus are no longer at issue in this appeal.

The underlying litigation has a lengthy procedural history, which we briefly summarize to give the necessary context to the current appeal. Plaintiffs originally filed this § 1983 action against various LSP officials and

---

[1] Wallace's murder conviction was overturned by the district court on a habeas motion in October 2013, and he was released. He died three days later of liver cancer.

No. 13-31289

the Louisiana Secretary of Corrections (collectively "LSP Defendants") in 2000, when Woodfox and Wallace had each been held in solitary confinement for over twenty years.[2]  They asserted that the LSP Defendants violated their First, Eighth, and Fourteenth Amendment rights by keeping them in such prolonged solitary confinement.  Plaintiffs sought compensatory and punitive damages, as well as an injunction ordering that they be removed from CCR and housed with the general prison population.  The district court denied the LSP Defendants' Rule 12(b)(6) motion to dismiss the due process claims based on qualified immunity.  On appeal, this court affirmed the denial of the motion to dismiss. *Wilkerson v. Stalder (Wilkerson I)*, 329 F.3d 431, 436 (5th Cir. 2003). The LSP Defendants subsequently filed for summary judgment on the basis of qualified immunity, arguing that the Plaintiffs' placement in CCR was an initial security classification that implicated no due process rights.  The district court denied that motion, holding that genuine issues of material fact precluded summary judgment and, alternatively, that the extraordinary duration of the solitary confinement gave rise to a protected liberty interest. *Wilkerson v. Stalder*, No. 3:00-CV-304 (M.D. La. Feb. 1, 2005) (report and recommendation of the magistrate judge, adopted by the district court on March 30, 2005).  The LSP Defendants did not appeal that ruling.

Woodfox was transferred to Wade in November 2010 and was immediately placed in a newly-created CCR unit, where he has remained ever

---

[2] A third plaintiff, Robert King Wilkerson, was placed in CCR after he was transferred to LSP in 1973, after he was accused and subsequently convicted of killing another inmate. He spent nearly twenty-eight years in solitary confinement at LSP.  Wilkerson's murder conviction was subsequently overturned, after which he pled to a lesser charge and was released from prison in 2001.  His claims are still pending in the district court against the LSP Defendants, but are not at issue in this appeal.

since.  In 2013, Plaintiffs obtained leave to file a Fourth Amended Complaint, to add the defendants at Wade and Hunt.  Woodfox named five Wade officials as defendants, including the Warden, Assistant Warden, and other prison officials he asserts have authority over his placement or continued detention in CCR (collectively "Wade Defendants").[3]  The newly added defendants filed a motion for summary judgment on the basis of qualified immunity.

The district court denied summary judgment to the Wade Defendants on two grounds.  First, it held that the Plaintiffs' summary judgment evidence raised genuine issues of material fact regarding whether their placement in CCR was an initial security classification or a punitive measure.  *Wilkerson II*, 2013 WL 6665452, at *7-8.  In support of its holding, the court noted that Woodfox produced evidence undercutting the Wade Defendants' arguments that they made an initial independent decision that Woodfox should be housed in CCR upon his 2010 transfer.  Plaintiffs produced evidence showing that there was no CCR tier at Wade prior to Woodfox's transfer, and that at the time of the transfer, no official ever had any intention to house Woodfox anywhere other than at CCR.  *Id.* at *7.  Further, the district court agreed that the Plaintiffs produced evidence questioning whether "an independent and sincere review of their records, age, and infirmity would lead a review board to find that they, like gang members or other dangerous inmates, should be housed in isolation," which suggested that Woodfox's placement "was not solely due to an independent initial classification."  *Id.*  The court also acknowledged the Plaintiffs' argument that the Wade Defendants, "having the benefit of

---

[3] On appeal, the parties, including the Defendants-Appellants, treat the Wade Defendants collectively, and make no argument specific to any of the individual defendants.

No. 13-31289

pending litigation to inform what they reflect in their record, had every advantage to use certain labels over others." *Id.* (internal alteration and quotation omitted). In light of this evidence produced by the Plaintiffs, the district court found that the few classification forms the Wade Defendants had produced on summary judgment did not meet their burden of persuasion to show that Woodfox's placement in CCR was solely the result of an initial classification. *Id.* at *8. In the alternative, the district court held that even if Woodfox's confinement in CCR was due to an initial classification, the "unparalleled amount of time" he had spent in solitary confinement was an "extraordinary circumstance" that implicated a liberty interest. *Id.* at *9. The district court stated that "Plaintiffs' approximately forty-year length of incarceration in extended lockdown is so atypical that the Court is unable to find another instance of an inmate spending even close to that much time in isolation." *Id.* The Wade Defendants appeal the denial of summary judgment based on qualified immunity.

## II. Discussion

"The doctrine of qualified immunity seeks to strike a balance between competing social objectives, providing breathing space for the 'vigorous exercise of official authority' while at the same time allowing a possibility of redress for victims of officials' abuses." *Kinney v. Weaver*, 367 F.3d 337, 349 (5th Cir. 2004) (en banc) (quoting *Butz v. Economou*, 438 U.S. 478, 506 (1978)). Therefore, "governmental officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). We evaluate claims of qualified immunity using a two-part test:

(1) whether the facts that a plaintiff has shown establish a violation of a constitutional right; and (2) whether the right was clearly established at the time of the defendant's alleged misconduct. *Pearson v. Callahan,* 555 U.S. 223, 232 (2009) (quotation marks omitted). We may examine these two factors in any order. *See id.* at 236 (overruling in part *Saucier v. Katz,* 533 U.S. 194 (2001)). To be "clearly established" for purposes of qualified immunity, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640 (1987). This inquiry "requires an assessment of whether the official's conduct would have been objectively reasonable at the time of the incident." *Kinney,* 367 F.3d at 350 (quotation omitted).

We review the scope of clearly established law and the objective reasonableness of the defendant government official's actions de novo. *Flores v. City of Palacios,* 381 F.3d 391, 394 (5th Cir. 2004). On interlocutory appeal from the denial of qualified immunity, our jurisdiction "is limited to a review of questions of law," and we "consider only whether the district court erred in assessing the legal significance of the conduct that the district court deemed sufficiently supported for purposes of summary judgment." *Id.* (quoting *Kinney,* 367 F.3d at 348). We view the facts in the light most favorable to the plaintiffs. *Id.*

A.     *The Liberty Interest*

"The Fourteenth Amendment's Due Process Clause protects persons against deprivations of life, liberty, or property; and those who seek to invoke its procedural protection must establish that one of these interests is at stake." *Wilkinson v. Austin,* 545 U.S. 209, 221 (2005). Thus, we must first determine whether Woodfox's incarceration in solitary confinement gives rise to a liberty

interest protected by due process. "A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,'" *id.* (citing *Vitek v. Jones*, 445 U.S. 480, 493-494 (1980) (finding a liberty interest in avoiding involuntary psychiatric treatment and transfer to mental institution)), "or it may arise from an expectation or interest created by state laws or policies," *id.* (citing *Wolff v. McDonnell*, 418 U.S. 539, 556-558 (1974) (finding a liberty interest in avoiding revocation of state-created system of good-time credits)). With regard to the latter, we focus on "the nature of the deprivation" resulting from a state regulation, rather than "the language of a particular regulation." *See Sandin v. Conner*, 515 U.S. 472, 481, 482-84 (1995); *Wilkinson*, 545 U.S. at 222-23. In *Sandin*, the Supreme Court held that, in addition to the obvious due process interests implicated by restrictions that lengthen a sentence, prisoners' liberty interests "will be generally limited to freedom from restraint which . . . imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484 (citations omitted); *see Wilkinson*, 545 U.S. at 223.

The Wade Defendants argue that we need not reach the *Sandin* "atypical and significant hardship" test. Instead, they argue that no liberty interest ever arose because Woodfox's incarceration in CCR is the result of an "initial classification" that the Wade Defendants made upon his transfer in 2010. We have stated that "generally speaking, a prisoner has no liberty interest in his custodial classification." *Hernandez v. Velasquez*, 522 F.3d 556, 562 (5th Cir. 2008); *see, e.g., Moody v. Baker*, 857 F.2d 256, 257-58 (5th Cir. 1988) ("An inmate has neither a protectable property nor liberty interest in his custody classification"). We have "repeatedly affirmed that prison officials should be accorded the widest possible deference in classifying prisoners' custodial status

as necessary to maintain security and preserve internal order." *Hernandez*, 522 F.3d at 562 (quotations and internal alteration omitted); *see also Wilkerson I*, 329 F.3d at 436. *Wilkerson I*, a previous opinion in this litigation, did suggest that a liberty interest would not arise from an initial classification when it stated that "if the inmates' confinement in extended lockdown is not the result of their initial classification, the *Sandin* test would be triggered." *Wilkerson* I, 329 F.3d at 436.

However, the recognized need to afford prison officials wide latitude to maintain safety and order in the prisons they manage must coexist with constitutional dictates. In recent precedent, the Supreme Court and this court have made clear that there is no dispositive bright line between deprivations resulting from initial custodial classifications and deprivations resulting from disciplinary measures. Notably, in *Wilkinson v. Austin*, the plaintiff prisoners asserted that placement in a Supermax facility in Ohio violated their due process rights. 545 U.S. at 213. Placement in the Supermax facility was made both by initial security classification and by subsequent reclassification based on conduct while in prison. *Id*. at 215-16. The Supreme Court never indicated that the liberty interest analysis was different when addressing an initial security classification or an administrative custodial determination, as opposed to a punitive disciplinary action. Instead, the Court simply applied the "atypical and significant hardship" test from *Sandin*. *Id*. at 223. Likewise, since the Supreme Court's decision in *Wilkinson*, we have stated that "when a prisoner demonstrates extraordinary circumstances," or in other words, an "atypical and significant hardship," he may "maintain a due process challenge to a change in his custodial classification." *Hernandez,* 522 F.3d at 562 (internal quotation marks omitted); *see also Tate v. Starks*, 444 F. App'x 720,

723-24 (5th Cir. 2011) (noting that extremely restrictive conditions constitute a "crucial exception to the general rule that a prisoner has no liberty interest in his classification").

The Wade Defendants also point to case law holding that, in general, administrative segregation does not implicate a liberty interest. We have stated that, "absent extraordinary circumstances," administrative segregation that is merely "incident to the ordinary life as a prisoner" is not grounds for a constitutional claim, because it simply "does not constitute a deprivation of a constitutionally cognizable liberty interest." *Pichardo v. Kinker*, 73 F.3d 612, 612-13 (5th Cir. 1996); *see also Luken v. Scott*, 71 F.3d 192, 193 (5th Cir. 1995) ("administrative segregation, without more, simply does not constitute a deprivation of a constitutionally cognizable liberty interest"). These statements, however, are best understood as alternative statements of the *Sandin* test: administrative segregation "without more" or "absent extraordinary circumstances" is administrative segregation that is merely incident to ordinary prison life, and is not an "atypical and significant hardship" under *Sandin*. *See Pichardo*, 73 F.3d at 612-13; *Luken*, 71 F.3d at 193. "In other words, segregated confinement is not grounds for a due process claim unless it 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" *Hernandez*, 522 F.3d at 562 (quoting *Sandin*, 515 U.S. at 484); *see also Hardaway v. Meyerhoff*, 734 F.3d 740, 743 (7th Cir. 2013) ("Whether a prisoner has a liberty interest implicated by [segregated] confinement relies on whether the confinement imposed an 'atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'").

No. 13-31289

We must therefore apply the *Sandin* test and determine whether Woodfox's continued solitary confinement at Wade constitutes "atypical and significant hardship. . . in relation to the ordinary incidents of prison life," such that a liberty interest in avoiding the deprivation arises. *See Wilkinson*, 545 U.S. at 223; *Sandin*, 515 U.S. at 484; *Hernandez*, 522 F.3d at 562-63.  Our conclusion flows directly from the Supreme Court's decisions in *Sandin* and *Wilkinson*.  "In deciding whether changes to an inmate's conditions of confinement implicate a cognizable liberty interest, both *Sandin* and [*Wilkinson*] considered the nature of the more-restrictive confinement *and* its duration in relation to prison norms and to the terms of the individual's sentence." *Harden-Bey v. Rutter*, 524 F.3d 789, 792 (6th Cir. 2008) (emphasis in original).  In *Sandin*, the Supreme Court held that no liberty interest was implicated by segregated confinement for thirty days, imposed as discipline for disruptive behavior.  *Sandin*, 515 U.S. at 485-86.  The Court found that in the circumstances of that case, segregated confinement did not "present a dramatic departure from the basic conditions of Conner's indeterminate sentence." *Id*. at 485.  The Court noted that inmates in the general population at the prison experienced "significant amounts of 'lockdown time,'" that the degree of confinement in disciplinary segregation was not excessive "in either duration or degree of restriction" compared to other types of restrictive confinement imposed on inmates, and that the thirty-day disciplinary segregation did not work a "major disruption in the inmate's environment." *Id*. at 486-87.

Subsequently, in *Wilkinson v. Austin*, the Supreme Court held that a prisoner's assignment to the Ohio Supermax facility entailed "highly restrictive conditions" of confinement, and did give rise to a liberty interest. 545 U.S. at 213, 224.  In the Ohio Supermax, inmates spent 23 hours a day in

single cells, with solid metal doors that prevented communication from one cell to another; prisoners took all their meals alone in their cells; and visitation opportunities were "rare," and conducted through glass walls. *Id.* at 214, 223-24. In addition, confinement at the Supermax facility was indefinite, and otherwise eligible inmates were disqualified for parole consideration by placement in Supermax. *Id.* at 224. The Court explained that "[w]hile any of these conditions standing alone might not be sufficient to create a liberty interest, taken together they impose an atypical and significant hardship within the correctional context," and held that the prisoners had a liberty interest in avoiding assignment to the Supermax facility. *Id.*

Following *Sandin* and *Wilkinson,* our sister circuits have considered the severity of the restrictive conditions and their duration as key factors in analyzing whether those conditions constitute an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *See Hardaway*, 734 F.3d at 743 ("In assessing whether disciplinary segregation amounts to a constitutional violation, this court looks to 'the combined import of the duration of the segregative confinement *and* the conditions endured.'"); *Harden-Bey*, 524 F.3d at 793 ("[M]ost (if not all) of our sister circuits have considered the nature of the more-restrictive confinement *and* its duration in determining whether it imposes an 'atypical and significant hardship.'" (emphasis in original)); *Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004) ("Factors relevant to determining whether the plaintiff endured an 'atypical and significant hardship' include 'the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions' and 'the duration of the disciplinary segregation imposed compared to discretionary confinement.'"); *Serrano v. Francis*, 345 F.3d 1071, 1078 (9th Cir. 2003) (noting

that relevant factors include "the duration of the condition, and the degree of restraint imposed"); *Shoats v. Horn*, 213 F.3d 140, 144 (3d Cir. 2000) (considering the amount of time the prisoner was placed in segregation and whether the conditions were significantly more restrictive than those imposed upon other inmates in solitary confinement).

Courts have considered different baselines when determining what conditions are "atypical" in a particular case. Some courts have compared the conditions for inmates in segregated confinement to inmates in the general population at the institution. *See Beverati v. Smith*, 120 F.3d 500, 504 (4th Cir. 1997). Some have compared the conditions of the segregated confinement at issue to conditions of segregation that are ordinary within the particular state's penal system as a whole. *See Griffin v. Vaughn*, 112 F.3d 703, 708 (3d Cir. 1997). One court has held that the appropriate comparison is to "the most restrictive confinement conditions that prison officials . . . routinely impose on inmates serving similar sentences." *Hatch v. District of Columbia*, 184 F.3d 846, 856 (D.C. Cir. 1999).

Here, considering the duration of the solitary confinement, the severity of the restrictions, and their effectively indefinite nature, it is clear that Woodfox's continued detention in CCR constitutes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life" according to any possible baseline we could consider.

We need not dwell on duration. Woodfox's incarceration in solitary confinement is now approaching an extraordinary thirty-nine years. This is almost five times the duration deemed sufficient to give rise to a liberty interest in *Shoats*. 213 F.3d at 144 ("[E]ight years in administrative custody, with no prospect of immediate release in the near future, is 'atypical' in relation

to the ordinary incidents of prison life"); *see also Laue v. Johnson,* 117 F. App'x 365, 366 (5th Cir. 2004) ("We will assume *arguendo* that Laue's eight years of confinement in administrative segregation constitutes an 'atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'"); *Harden-Bey,* 524 F.3d at 793 (finding due process complaint was incorrectly dismissed where it alleged three years of administrative segregation which was "not improbably" indefinite).  By contrast, the duration in segregated confinement that courts have found does not give rise to a liberty interest ranges up to two and one-half years, a mere fraction compared to the duration of Woodfox's solitary confinement.  *See Jones v. Baker,* 155 F.3d 810, 812-13 (6th Cir. 1998) (holding that administrative segregation for two and one-half years did not give rise to a liberty interest); *Griffin*, 112 F.3d at 708 (finding that inmate's placement in administrative segregation for fifteen months did not give rise to a liberty interest); *Hernandez*, 522 F.3d at 563 (finding that protective lockdown for twelve months did not give rise to a liberty interest).

Coupled with this extraordinary duration, the conditions in CCR are sufficiently restrictive so as to constitute an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484.  In *Wilkinson*, inmates at Ohio Supermax ("OPS") were confined for 23 hours a day in individual cells with metal doors, where inmates ate all their meals alone, visits were rare and conducted through a window, placement was indefinite, and inmates were automatically made ineligible for parole. *Wilkinson*, 545 U.S. at 214, 223-24.  In the present case, the district court found that,

No. 13-31289

> Here, there are similar severe conditions of confinement. Like the conditions at OPS, inmates housed in Hunt and Wade's CCR unit are confined alone to their cells for 23 hours per day with one hour designated for exercise and a shower period. Inmates on the CCR unit are not afforded the same ability to partake in religious or educational opportunities or to enjoy other privileges as those housed in general population.

*Wilkerson II*, 2013 WL 6665452, at *8. Though there are some distinctions between the conditions at Ohio Supermax and CCR at Wade, notably that no parole ramifications appear to attach to CCR, the record evidence supports the district court's finding that there are material and substantial similarities. In both cases, prisoners are isolated in their cells for 23 hours a day, the exercise allowed in the one hour outside of their cells is limited to isolated areas, there are significant limitations on human contact, and placement is indefinite. The Wade Defendants argue that restrictions in CCR are not sufficiently severe, because they assert that Woodfox is allowed some contact visits, telephone privileges, peer counseling, and correspondence courses. Were the duration of Woodfox's solitary confinement less lengthy, such distinctions might become material. Here, however, we consider the 23-hour-a-day in cell isolation, limited physical exercise, and limited human contact, together with the extraordinary length of time that Woodfox has been held in such conditions. Viewed collectively, there can be no doubt that these conditions are sufficiently severe to give rise to a liberty interest under *Sandin*.

This is particularly true in light of the district court's factual finding that Woodfox's solitary confinement at Wade is effectively indefinite. In *Wilkinson*, the Supreme Court considered the indefinite duration of the confinement at Supermax to be a significant factor. *See Wilkinson*, 545 U.S. at 214-15, 224. Here, the district court stated:

15

No. 13-31289

Additionally, as this Court has previously found the Plaintiffs' placement in CCR was and remains indefinite. When determining that the Plaintiffs' placement in CCR was indefinite at LSP, the Court observed,

> In the present matter, the Review Board's rote repetition of the reason for the inmates continued confinement as being the same reason they were initially placed in lockdown effectively eliminates any possibility of release, regardless of their current situation and behavior while in lockdown. The original reason for placement in lockdown can never change; thus plaintiffs' current situation of "indefinite placement" in lockdown is static, with no hope of release other than by death or release from the prison entirely, as was the case for plaintiff Wilkerson.

As the evidence in the present matter demonstrates, this practice of rote repetition has continued at Hunt and Wade.

*Wilkerson II*, 2013 WL 6665452, at *9. We agree with the district court that the summary judgment evidence, viewed in the light most favorable to Woodfox, shows that his solitary confinement is effectively indefinite.

Whether we compare Woodfox's nearly thirty-nine years in 23-hour-a-day isolation to other inmates in the general population, other inmates in segregated confinement within the Louisiana system as a whole, or other inmates serving life sentences, these conditions constitute an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484. Whatever the "ordinary incidents of prison life" may encompass, they can only be truly "ordinary" when experienced by some measurable proportion of a baseline prison population. In *Shoats*, the Third Circuit held that the parties "do not dispute the fact that very few Pennsylvania prisoners have been confined in administrative custody

for periods of eight years or more," and found that the uniqueness of the duration, together with restrictive conditions, was sufficient to render that confinement "atypical." *See Shoats*, 213 F.3d at 144.  Here, the district court specifically found that "Plaintiffs' approximately forty-year length of incarceration in extended lockdown is so atypical that the Court is unable to find another instance of an inmate spending even close to that much time in isolation." *Wilkerson II*, 2013 WL 6665452, at *9.  Indeed, the Defendants acknowledged at oral argument that there is no other inmate in Louisiana that has been held in CCR for as long as Woodfox.  Even if there may be some small number of unknown prisoners in a comparable situation, it is clear that Woodfox's decades-long, effectively indefinite solitary confinement cannot be classified as "ordinary" according to any measure. *See Shoats,* 213 F.3d at 144.

Although it is true that Woodfox was confined in CCR at LSP, an institution outside the management of the Wade Defendants, for thirty-five of the nearly thirty-nine years of his solitary confinement, in the circumstances of this case we must consider the entire duration.  We reject the Wade Defendants' assertion—unsupported by any authority—that Woodfox's previous decades in solitary confinement are irrelevant to the question of his due process rights now.  "Due process is flexible and calls for such procedural protections as the particular situation demands." *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976) (quotation omitted).  In the present case, the Wade Defendants did not confront Woodfox as a newly convicted inmate, entirely unknown to them, with no institutional record.  Instead, in November 2010, part of the circumstances to be considered upon his transfer was that Woodfox had already been subjected to over three decades in solitary confinement, in

17

the same prison system, under the same ultimate administration, and with the same continuing justification for the confinement.

In comparable situations, other circuits have aggregated time spent in different facilities when deciding whether a liberty interest was implicated by administrative segregation. In *Giano v. Selsky*, the Second Circuit found it particularly appropriate to aggregate the time the plaintiff spent in administrative segregation at two facilities where "the two periods of confinement were based on the same administrative rationale and that the conditions of [the plaintiff's] confinement were, for all practical purposes, identical at both facilities." 238 F.3d 223, 226 (2d Cir. 2001). Similarly, in *Shoats*, the plaintiff prisoner had been transferred among multiple institutions in the state and federal prison system. 213 F.3d at 142. Shoats was originally placed in administrative custody in 1989 at the State Correctional Institution in Dallas, Pennsylvania ("SCI-Dallas"). *Id.* He was subsequently transferred to the federal penitentiary at Leavenworth, Kansas, and returned to SCI-Dallas in June 1991, where he was placed back in administrative custody. *Id.* In January 1995, he was transferred to a state correctional institution in Greene, Pennsylvania, and continued to be held in administrative custody. *Id.* In determining whether that continued administrative custody implicated a liberty interest, the Third Circuit considered the entire cumulative eight-year period of the prisoner's administrative custody in the state system. *See id.* at 143-44.

Given the extraordinarily lengthy detention and the isolating, restrictive conditions that we consider here, there is no basis for concluding that prison officials may avoid the established constitutional rights of prisoners by

transferring them to a new facility and wiping the slate clean, while continuing all of the conditions that the prisoner has challenged.

### B.      Clearly Established Law

Having found a liberty interest, we must now determine whether that liberty interest was sufficiently clearly established at the time of Woodfox's 2010 transfer, such that a reasonable official would have understood that the failure to provide adequate procedural protections violated the Constitution. The touchstone of this inquiry is "fair warning." *See Kinney*, 367 F.3d at 350. "The law can be clearly established 'despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights.'" *Id.* (quoting *Hope v. Pelzer*, 536 U.S. 730, 740 (2002)).

The Wade Defendants contend that, despite subsequent developments in the law, they were objectively reasonable in relying on the assumption in *Wilkerson I* that a liberty interest could not arise from an initial classification, regardless of the duration or indefiniteness of Woodfox's solitary confinement. *See Wilkerson I*, 522 F.3d at 435-36.

However, the law did not freeze with the decision in *Wilkerson I* in 2003. As we have said, prior to the 2010 transfer of Woodfox, both our court and the Supreme Court had recognized that even if an initial security classification does not generally implicate a liberty interest, such an interest may arise where an initial classification is also attended by "extraordinary circumstances," that is, an "atypical and significant hardship." *See Wilkinson*, 545 U.S. at 213, 222-24; *Hernandez*, 522 F.3d at 562-63.  The Supreme Court's 2005 decision in *Wilkinson* made it clear that "indefinite" placement in "highly

restrictive conditions" implicates a liberty interest, even if that placement is the result of an initial classification.  *Wilkinson*, 545 U.S. at 213, 222-24.  *Wilkinson* clearly negates any assumption in *Wilkerson I* that a decision based upon an initial classification could never give rise to due process concerns.  Likewise, in our 2008 decision in *Hernandez*, we clearly stated: "Only when a prisoner demonstrates 'extraordinary circumstances' may he maintain a due process challenge to a change in his custodial classification."  522 F.3d at 562.

In 2010, a reasonable prison official would have been on notice that continuing Woodfox's solitary confinement would give rise to a liberty interest requiring procedural protections.  Prior to Woodfox's transfer to Wade, cases such as *Wilkinson* and *Hernandez* made clear that even an initial security classification may give rise to a liberty interest if the *Sandin* "atypical and significant hardship" test is met.  *See Wilkinson,* 545 U.S. at 223; *Hernandez,* 522 F.3d at 562; *see also Tate*, 444 F. App'x at 723-24.  Woodfox was subjected to the sort of 23-hour-a-day in-cell confinement, limited physical exercise, limited human contact, and effectively indefinite placement that gave rise to a liberty interest in *Wilkinson.*  Any differences between the Supermax conditions in *Wilkinson* and the CCR conditions at Wade are insufficient to render reasonable the conclusion that there is no liberty interest here.

This conclusion is cemented by the unprecedented duration of Woodfox's incarceration in CCR.  It is difficult, if not impossible, to imagine circumstances more "extraordinary" than nearly four decades in solitary confinement.  Courts applying the *Sandin* test have always considered the duration of the restrictions to be a central factor in the analysis.  *See Hernandez,* 522 F.3d at 563 (contrasting twelve months of protective lockdown with thirty years); *Hardaway,* 734 F.3d at 743; *Harden-Bey*, 524 F.3d at 792; *Palmer,* 364 F.3d at

64; *Serrano,* 345 F.3d at 1078; *Shoats,* 213 F.3d at 144.  Indeed, in *Hernandez,* this court expressly characterized the CCR conditions at issue here as "extreme conditions" and contrasted the *Hernandez* plaintiff's twelve months of protected lockdown with Woodfox, who had been "kept on lockdown status for 30 years."  *Hernandez,* 522 F.3d at 563.  In the circumstances of this case, no reasonable prison official could conclude that continuing four decades in indefinite solitary confinement would not implicate a liberty interest protected by due process.

### C.    Adequacy of Process

We hold that Woodfox has a clearly established liberty interest.  It does not follow that this type of extended lockdown is necessarily impermissible in every circumstance, but that it is such an "atypical and significant hardship" that the prison officials must provide adequate procedural protections to the inmate.  *See Wilkinson,* 545 U.S. at 224-29 (holding that the prison system provided adequate due process by providing informal, non-adversary procedures which included multiple levels of review for any decision recommending OPS placement, and a placement review within 30 days of the initial assignment).  Here, the district court found that genuine issues of material fact precluded summary judgment on the question of whether the procedures for review of CCR placement at Wade were constitutionally adequate.  *Wilkerson II,* 2013 WL 6665452, at \*9-11.  The Wade Defendants do not challenge this holding on appeal, and conceded at oral argument that if we were to find a liberty interest, the case must be remanded to determine the adequacy of the procedures.  Having found a clearly established liberty interest, we affirm the denial of summary judgment based on qualified

immunity and leave the question of the adequacy of the process to be resolved in the district court.

### III.  Conclusion

For the foregoing reasons, the district court's denial of qualified immunity is AFFIRMED.  The case is remanded for further proceedings consistent with this opinion.