**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 14-6411

LUMUMBA K. INCUMAA, a/k/a Theodore Harrison, Jr.,

Plaintiff - Appellant,

v.

BRYAN P. STIRLING, Acting Director of the South Carolina
Department of Corrections,

Defendant - Appellee.

Appeal from the United States District Court for the District of
South Carolina, at Beaufort.  David C. Norton, District Judge.
(9:12-cv-03493-DCN)

Argued:  March 24, 2015                 Decided:  July 1, 2015

Amended:  July 7, 2015

Before MOTZ, KEENAN, and THACKER, Circuit Judges.

Affirmed in part, reversed in part, and remanded by published
opinion.  Judge Thacker wrote the opinion, in which Judge Motz
and Judge Keenan joined.

**ARGUED**: Emily K. Merki, GEORGETOWN UNIVERSITY LAW CENTER,
Washington, D.C., for Appellant.  Andrew Lindemann, DAVIDSON &
LINDEMANN, P.A., Columbia, South Carolina, for Appellee.  **ON
BRIEF**: Steven H. Goldblatt, Center Director, Ruthanne M.
Deutsch, Supervising Attorney, Lola A. Kingo, Supervising
Attorney, Ryan A. Sellinger, Student Counsel, Appellate
Litigation Program, GEORGETOWN UNIVERSITY LAW CENTER,
Washington, D.C., for Appellant.

THACKER, Circuit Judge:

Lumumba Kenyatta Incumaa ("Appellant") is a member of the Nation of Gods and Earths ("NOGE"), a group whose adherents are also known as "Five Percenters." In 1988, Appellant began serving a sentence of life imprisonment without the possibility of parole in a prison operated by the South Carolina Department of Corrections (the "Department" or "Appellee").[1] Following his participation in a 1995 prison riot with other Five Percenters, he was placed in solitary confinement security detention. He has remained in solitary confinement for 20 years, despite not having committed a single disciplinary infraction during that time.

With this suit, Appellant challenges his confinement on two grounds. Appellant's first cause of action arises under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-1, which prohibits a state from imposing a substantial burden on an inmate's religious exercise unless it proves that the restriction furthers compelling interests by the least restrictive means. In this regard, Appellant argues that Department policy required him to renounce

_____

[1] Appellant originally sued Department Director William Robert Byars Jr. in his official capacity. The current Department Director, Bryan Stirling, replaced Byars as the defendant. Because Stirling was sued in his official capacity, we will refer to him and Appellee synonymously.

his affiliation with the NOGE, which he alleges is a religion, before the Department will release him from solitary confinement. On the second ground, Appellant claims that Appellee violated his right to procedural due process.

The district court granted Appellee's motion for summary judgment. We affirm the portion of the district court order discarding Appellant's RLUIPA claim, which, we agree, was not sufficient to go before a jury. However, we reverse the grant of summary judgment as it relates to Appellant's due process claim. Appellant's 20-year period of solitary confinement, we hold, amounts to atypical and significant hardship in relation to the general population and implicates a liberty interest in avoiding security detention. Furthermore, there is a triable dispute as to whether the Department's process for determining which inmates are fit for release from security detention meets the minimum requirements of procedural due process.

I.

A.

The Five Percenters and Appellant's Violent History

The NOGE is an "offshoot" of the Nation of Islam and other religious groups "in the Islamic sphere" that "preach[] a

3

message of black empowerment." J.A. 91, 92.[2] The Five Percenters also have a history of violence in South Carolina prisons.[3] As a result, the parties maintain differing views of the Five Percenters. Appellant maintains the NOGE is a religious group. Although Appellee does not contest Appellant's claim that the NOGE meets the legal definition of a religion, the Department's regulations treat the Five Percenters like a violent gang. Of note, at times, the Five Percenters have themselves denied that their organization is a religion. See id. at 131 (stating, on the cover of "The Five Percenter" newsletter, "WE ARE NOT A RELIGION" (emphasis in original)).

In April 1995, a group of Five Percenters -- including Appellant -- organized a prison riot. The assailants took three Department employees hostage and held them for 11 hours during an intense standoff with police.[4] Four law enforcement officers

---

[2] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

[3] In In re Long Term Administrative Segregation of Inmates Designated as Five Percenters, we observed that a federal intelligence summary concluded the Five Percenters were "a radical Islamic sect/criminal group that is often boldly racist in its views, prolific in its criminal activities, and operates behind a facade of cultural and religious rhetoric." 174 F.3d 464, 467 (4th Cir. 1999) (internal quotation marks omitted).

[4] In Incumaa v. Ozmint, we noted that Appellant pleaded guilty to "three counts of hostage-taking and two counts of assault and battery with intent to kill in relation to his involvement in the prison riot"; his conviction was vacated on
(Continued)

4

were hospitalized.  Following this violent uprising, on June 16, 1995, Appellee designated the Five Percenters as a Security Threat Group ("STG").[5]

B.

Prison Regulation of STGs and their Members

1.

Assignment of STG Members to Special Management Unit

When the Department's Special Investigations Unit suspects that an inmate is a member of an STG, the unit conducts a "rigorous investigation" to confirm the inmate's association. J.A. 126.  If the investigators validate the inmate's STG membership, the Department's Institutional Classification Committee ("ICC") either recommends labeling the inmate as Validated-GP, which allows him to reside in the general population, or designates him as Validated-SD, which entails placement in security detention.  According to Department Investigator Elbert Pearson,

> If an individual has been validated as an STG member, but has not committed or been implicated in any disciplinary infractions

---

ineffective-assistance-of-counsel grounds.  507 F.3d 281, 283 n.1 (4th Cir. 2007).

[5] The Five Percenters were implicated in at least 484 incidents "of violence and other disruptive conduct" within the Department prison network from 2003 to 2013.  J.A. 220, 222.

or STG activities, that individual would typically, although not always, receive a classification of Validated-GP . . . .
　　If an individual has been validated as an STG member, and has committed disciplinary infractions . . . that individual would typically receive a classification of Validated-SD . . . .

Id. at 126-27. Security detention, in contrast to disciplinary detention, is not a punishment for disciplinary infractions but is used to protect inmates and staff and to maintain prison order.

If the ICC classifies an STG inmate as Validated-SD, it then determines where to place the inmate and what restrictions to impose upon him. The Department maintains two security detention units. A Validated-SD inmate can be assigned either to the Special Management Unit ("SMU") or the more restrictive Maximum Security Unit, which houses inmates who have engaged in violent behavior or have committed serious rules infractions. The ICC also determines the inmate's "behavior level," which dictates the inmate's restrictions and privileges while in his respective unit. J.A. 137. "Inmates who have been assigned to [s]ecurity [d]etention without serving [d]isciplinary [d]etention" are designated as Level II, and "inmates charged with . . . assault on a staff member and/or

inmate" are "automatically . . . assigned to Level I."[6]   Id.
Level I inmates are held in the "strictest degree of custody and
control" available in their unit.   Id. at 149.

Due to his role in the 1995 riot, Appellant was
validated as a Five Percenter, designated Validated-SD, and
placed in the Maximum Security Unit.   His assignment to security
detention was not a punishment for participating in the riot but
was generally intended "to maintain and control the inmate and
to provide safety and security for the staff and other inmates."
J.A. 284.   Appellant was transferred to the SMU in 2005, and he
has remained in the SMU as a Level II inmate since that time.
He is currently one of only two Five Percenters housed in the
SMU -- other validated Five Percenters are permitted to reside
in the general population and openly maintain their affiliation
with the group.   During the decades Appellant has spent in
security detention, he has not committed a single disciplinary
infraction.

---

[6] Although the Department regulations only mention two
behavior levels, the ICC's classification notices imply that a
Level III also exists.   See Incumaa v. Ozmint, 507 F.3d at 283-
84 (discussing Level III classification).

7

2.

Conditions in SMU versus General Population

Appellant claims the SMU is substantially more restrictive than the general population. The Department does not contradict this account. As an SMU inmate, Appellant is

- confined to his cell "24 hours a day on non-recreation and non-shower days";

- permitted to leave his cell for recreation only one hour approximately ten times per month;

- allowed only a ten-minute shower three times per week;

- "stripped [sic] searched, made to lift and shake his genitalia, made to bend over, spread his buttocks in the direction of the officer so that he may look at [Appellant's] anus, then made to squat and cough, and afterwards hand cuffed behind his back every time he leaves the cell, even to the shower where he is locked in a single occupancy shower stall";

- served smaller portions of food than inmates in the general population receive;

- required to eat all meals in his cell;

- limited to property that can fit into a box that is 15 by 12 by 10 inches;

- "denied all canteen privileges";

- denied "education and vocational opportunities"; and

- "denied the opportunity to receive mental health treatment for his diagnosed mental health condition."

8

J.A. 23-24.

3.

Review of SMU Detention

Department regulations require the ICC to review each SMU inmate's candidacy for release every 30 days. According to Pearson, there are three bases on which the ICC may recommend reclassification and release from the SMU: (1) the inmate renounces affiliation with the STG;[7] (2) improvement in behavior level; or (3) the Department Director removes the inmate's group from the STG list.

To renounce his affiliation, the inmate "fills out a detailed questionnaire about why he or she wants to renounce membership" in the STG. J.A. 127. The ICC then reviews the questionnaire and determines whether the inmate's attempt to renounce STG affiliation is sincere. Consequently, the ICC may choose to reject an inmate's attempt to renounce his affiliation. See Reply to Pl.'s Resp. to Defs.' Mot. for Summ.

---

[7] Pearson diverges from the letter of the Department regulations on this point to some extent. The Department regulations do not mention the renunciation policy; they only state that "[i]nmates who have clear disciplinary records and who comply with unit procedures, inmate grooming and sanitation standards will be considered for . . . release from SMU." J.A. 138. However, because we must interpret the evidence in the light most favorable to Appellant -- and because Appellee apparently concedes this point -- we will assume that the renunciation policy is a feature of the Department regulations.

Jud. at 2, Incumaa v. Byars, No. 9:12-cv-03493 (D.S.C. Dec. 12, 2012; filed Aug. 31, 2013), ECF No. 34 ("It is unclear whether [the Department] would even allow the Plaintiff to renounce and be reassigned to the general population given his involvement as a ringleader in the 1995 riot . . . .").

With regard to reclassifications based on "behavior level," J.A. 138, Department regulations state:

> Inmates who have clear disciplinary records and who comply with unit procedures . . . will be considered for advancement from Level I to Level II or release from SMU. . . . The decision to release an inmate from SMU . . . will be based upon the inmate's overall disciplinary record and compliance with all Agency policies and procedures while in SMU.

Id. at 138, 139. The ICC has authority "to reduce or advance the inmate's Level as it deems appropriate." Id. at 138. Pursuant to Department regulations, after each 30-day review period, the ICC is required to deliver a notice of its classification decision to the inmate within 48 hours. However, the regulations do not require the ICC to provide any factual basis for its decision to maintain an inmate at the same behavior level or to recommend against release from the SMU.

The record contains copies of the ICC's classification notices to Appellant, and these notices span nine months -- February to November 2012 -- of his solitary confinement. Each

10

notice is nearly identical to the next and simply states that Appellant continues to be held in the SMU and "remain[s] Level II." J.A. 95-103. All provide the same perfunctory, five-letter justification for this recommendation: "STG-SD." Id. The ICC's required 30-day reviews are also documented on Department records labeled Form 18-68, also known as "Staff Memoranda." Id. at 138. The record contains the Staff Memoranda documenting review of Appellant's confinement in the SMU every 30 days from May 2008 to May 2013.[8] In total, there are 64 entries in the record. All but one of them is accompanied by the same comment: "Warden's review, 30 day ICC & monthly visit." Id. at 156-58. The single varying entry -- on April 25, 2012 -- states that Appellant "remain[ed] in SMU" and would "not renounce his affiliation" with the Five Percenters. Id. at 158. None of the entries provides a detailed explanation of the basis for Appellant's continued confinement.

According to Department regulations, the ICC's periodic release review is single-layered.[9] The warden does not

---

[8] Although prison officials claim that Appellant's custody has been reviewed every 30 days since his transfer to the SMU, the Department did not produce the Staff Memoranda from, 2005 to 2007.

[9] Although 30-day status reviews are entered as "Warden's Review" on the Staff Memoranda, it appears from the record that the ICC conducts these evaluations on the warden's behalf. Where they discuss review for release from the SMU, the (Continued)

11

review the ICC's decision regarding confinement unless the inmate "appeal[s] the decision of the ICC through the inmate grievance system" or the ICC recommends release from security detention, in which case "[t]he ICC must ensure the concurrence of the Warden/Designee for the inmate's release."[10]  J.A. 137, 139.

Appellant filed a grievance on April 21, 2009, alleging that the ICC "refus[ed] to consider [him] for a lower security detention level until and unless [he] renounce[d] [his] faith" -- which, he said, "impose[d] a substantial burden on [his] ability to exercise [his] religion."  J.A. 12.  In the section marked "action requested," Appellant requested reform of

---

Department regulations emphasize the ICC's role, not the warden's: "The decision to release an inmate from SMU can be recommended by the ICC," and "[t]he ICC . . . ha[s] the authority to reduce or advance the inmate's Level as it deems appropriate based on the inmate's behavior while housed in SMU." J.A. 138, 139.  Additionally, the regulations state that "the Warden must review the status of all inmates in continuous confinement for more than 30 days," but direct staff to document reviews on a form entitled "SCDC Form 19-30, SMU Institutional Classification Committee Review."  Id. at 138 (internal quotation marks omitted).

[10] While the Department regulations, read literally, only permit inmates to appeal the ICC's decision to place them in security detention, Appellant was allowed to file a grievance regarding the ICC's decision that he remain in the SMU. Therefore, for the purposes of this case we will interpret the regulations as authorizing inmates already in the SMU to oppose a classification review decision through the grievance system.

12

the STG policy "so that classifications are made on an individual, not religious basis." Id. Appellant also requested "regular and periodic evaluations by the [ICC] of [his] STG classification." Id. The warden responded that Appellant's requests could not be accommodated because "[t]he issue [Appellant] addressed is an issue against policy, which cannot be changed" by the administrators of the prison because policy changes "are made at the institutional level." Id. at 13. Accordingly, the warden denied Appellant's grievance. Appellant appealed the warden's decision to the Department's director, who concurred with the warden because Appellant "ha[d] been informed on what procedures [he] must follow to be considered for release from the [SMU], to include renouncing [his] affiliation with [the Five Percenters]." Id. at 14.

## C.

### Procedural History

On December 12, 2012, Appellant filed a pro se complaint pursuant to 42 U.S.C. § 1983. Appellant claimed that the Department's renunciation policy violated his rights under RLUIPA. Appellant also claimed that, throughout his detention in the SMU, the Department violated his procedural due process rights by failing to conduct meaningful review of whether he was fit for release to the general population. Appellee moved for

13

summary judgment on both of these claims. The district court granted the motion. Though the court assumed that the NOGE constituted a religion -- and apparently determined that Appellant's confinement imposed a substantial burden on his beliefs -- it nonetheless concluded that the Department's policy was "the least restrictive means of furthering the government's compelling interests" and therefore did not violate RLUIPA. Incumaa v. Stirling, No. 9:12-cv-03493, 2014 WL 958679, at *7 (D.S.C. Mar. 11, 2014). The court also held that Appellant's procedural rights were not violated because he failed to prove that his circumstances of imprisonment "[rose] to the level of an atypical and substantial hardship" -- a prerequisite to establishing a due process right to review for release from security detention. Id. at *10. Appellant filed a timely appeal.

Appellant argues that a reasonable juror may find that Department policy places a substantial burden on his exercise of religion because it conditions release from the SMU on renouncing his NOGE faith. He also argues that the district court erred in concluding that the conditions he has experienced for the last 20 years in solitary confinement do not constitute atypical and significant hardship in relation to the ordinary incidents of prison life.

14

II.

"We review the district court's grant of summary judgment de novo. . . . As to those elements on which it bears the burden of proof, a government is only entitled to summary judgment if the proffered evidence is such that a rational factfinder could only find for the government" and it is entitled to judgment as a matter of law. Smith v. Ozmint, 578 F.3d 246, 250 (4th Cir. 2009). To make this determination, we review the entire record, evaluating the evidence in the light most favorable to Appellant. See Beverati v. Smith, 120 F.3d 500, 503 (4th Cir. 1997).

III.

A.

RLUIPA Claim

In relevant part, RLUIPA states:

No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . , even if the burden results from a rule of general applicability, unless the government demonstrates that the imposition of the burden on that person--

(1) is in furtherance of a compelling governmental interest; and
(2) is the least restrictive means of furthering that compelling governmental interest.

15

42 U.S.C. § 2000cc-1(a).[11]

By enacting RLUIPA, Congress afforded prisoners free-exercise rights similar to those enjoyed by the free population. See Cutter v. Wilkinson, 544 U.S. 709, 715-17 (2005). RLUIPA prescribes a shifting burden of proof for inmate religious exercise claims. The inmate bears the initial burden to demonstrate that the prison's policy exacts a substantial burden on religious exercise. If the inmate clears this hurdle, the burden shifts to the government to prove its policy furthers a compelling governmental interest by the least restrictive means. See 42 U.S.C. § 2000cc-2(b).

A prison regulation may impose a "substantial burden" by forcing "a person to 'choose between following the precepts of her religion and forfeiting [governmental] benefits, on the one hand, and abandoning one of the precepts of her religion . . . on the other hand.'" Lovelace v. Lee, 472 F.3d 174, 187 (4th Cir. 2006) (alterations in original) (quoting Sherbert v. Verner, 374 U.S. 398, 404 (1963)). In other words, the regulation places the person between a rock and a hard place.

---

[11] As a "governmental entity created under the authority of a State," the Department "fit[s] within [the] definition" of "government." Smith v. Ozmint, 578 F.3d 246, 250 (4th Cir. 2009).

16

For example, in Couch v. Jabe, an inmate claimed that his religious beliefs required him to grow a one-inch beard. 679 F.3d 197, 199 (4th Cir. 2012). Prison policy forbade facial hair and the prison "limit[ed] or t[ook] away governmental benefits" to enforce the beard ban. Id. at 200. If the inmate cut his beard, the prison reinstated the benefits. We held that this practice "fit squarely within the accepted definition of substantial burden" because it forced the inmate to choose between following the edicts of his religion and losing privileges. Id. (internal quotation marks omitted).

The Supreme Court recently held the same. In Holt v. Hobbs, a prisoner faced "serious disciplinary action" if he grew a beard as dictated by his religion. 135 S. Ct. 853, 862 (2015). The Court concluded that "put[ting] petitioner to [the] choice" between punishment and violating his beliefs "substantially burden[ed] his religious exercise." Id.

Here, Appellant argues that the Department policy similarly imposes a substantial burden on his religious exercise because it "forces [him] to choose between continued adherence to his religion in solitary confinement, on one hand, and the far more favorable living conditions of the general population,

17

on the other." Appellant's Br. 49.[12] For purposes of this case, we assume without deciding that the Five Percenters are a religious group entitled to protection. This argument fails because the Department Policy forces no such choice upon him. Indeed, according to Pearson, renunciation is only one of three avenues for securing release from the SMU, and Department Policy does not guarantee release even if a Validated-SD inmate does renounce. <u>See</u> J.A. 127. Moreover, Appellant himself acknowledges that other Five Percenters are permitted to reside in the general population and openly maintain their affiliation. Appellant's argument that the Department's singular goal is to make him renounce his religion is further undermined by the fact that Department officials permit Appellant to possess NOGE materials while in the SMU but ban these items in the general population.

Appellant notes that he has not committed any disciplinary infractions since the 1995 riot and points us to one entry in the Staff Memoranda where an SMU staff member mentioned that Appellant refused to renounce his NOGE affiliation. He argues that this evidence demonstrates that

---

[12] Appellant mentions in passing that SMU regulations also prevent him from celebrating "Honor Days," the NOGE's highest holidays, but the only substantial burden he argues in his brief relates to the Department renunciation policy. Appellant's Br. 48.

18

renunciation must be a prerequisite to returning to the general population. Although "administrative segregation may not be used as a pretext for indefinite confinement," on this record it would be unreasonable to conclude that the ICC has no plausible reason other than Appellant's refusal to renounce his NOGE affiliation for continuing to view Appellant as a threat to prison staff and other inmates. Hewitt v. Helms, 459 U.S. 460, 477 n.9 (1983); see also Cutter, 544 U.S. at 717 (noting that Congress "anticipated . . . that courts would apply [RLUIPA] with due deference to the experience and expertise of prison and jail administrators" (internal quotation marks omitted)).

In sum, no reasonable factfinder could conclude that Appellant's renunciation of his faith is a prerequisite to returning to the general population. Appellant has failed to demonstrate that the Department's policy imposes a substantial burden on his religion. Therefore, we conclude that Appellee must prevail on the RLUIPA claim as a matter of law.

B.

Due Process Claim

Appellant also presses a procedural due process claim. Our analysis of this claim entails a two-step process. First, we determine whether Appellant had a protectable liberty interest in avoiding security detention. See Burnette v. Fahey, 687 F.3d 171, 180 (4th Cir. 2012). Second, we then evaluate

19

whether the Department failed to afford Appellant minimally adequate process to protect that liberty interest. See id. at 181. For the reasons that follow, we conclude Appellee cannot prevail on either of these sub-issues as a matter of law. Therefore, we reverse the district court's order of summary judgment as to Appellant's procedural due process claim.

1.

Liberty Interest

Although "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights," a prisoner's right to liberty does not entirely disappear. Price v. Johnson, 334 U.S. 266, 285 (1948); see also In re Long Term Admin. Segregation of Inmates Designated as Five Percenters, 174 F.3d 464, 468 (4th Cir. 1999). "[F]ederal courts must take cognizance of the valid constitutional claims of prison inmates." Turner v. Safley, 482 U.S. 78, 84 (1987). In Sandin v. Conner, the Supreme Court declared that prisoners have a liberty interest in avoiding confinement conditions that impose "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." 515 U.S. 472, 484 (1995). The Court reaffirmed the Sandin standard in Wilkinson v. Austin, 545 U.S. 209 (2005).

Recently, in Prieto v. Clarke, we held that Sandin, Wilkinson, and our precedent "do[] not hold that harsh or

20

atypical prison conditions in and of themselves provide the basis of a liberty interest giving rise to Due Process protection." Prieto v. Clarke, 780 F.3d 245, 249 (4th Cir. 2015). Rather, inmates must first establish that an interest in avoiding onerous or restrictive confinement conditions "arise[s] from state policies or regulations" (e.g., a regulation mandating periodic review). Id. (internal quotation marks omitted). Because there is uncontroverted evidence that the Department policy here mandates review of Appellant's security detention every 30 days, we have no trouble concluding that Appellant has met the first prong of his burden under Sandin and its progeny. The predominant question in this case, rather, is whether Appellant established that the conditions he experienced during his two decades in solitary confinement present atypical and significant hardship in relation to the ordinary incidents of prison life.

Whether confinement conditions are atypical and substantially harsh "in relation to the ordinary incidents of prison life" is a "necessarily . . . fact specific" comparative exercise. Beverati v. Smith, 120 F.3d 500, 502, 503 (4th Cir. 1997); accord Ramirez v. Galaza, 334 F.3d 850, 861 (9th Cir. 2003) ("There is no single standard for determining whether a prison hardship is atypical and significant, and the condition or combination of conditions or factors . . . requires case by

21

case, fact by fact consideration." (alteration in original) (internal quotation marks omitted)). In Prieto, we recognized that the Sandin standard contains two parts. Cf. Prieto, 780 F.3d at 253-54. First, we determine what the normative "baseline" is: what constitutes the "ordinary incidents of prison life" for this particular inmate? Id. at 253 ("What the inmates in Beverati could expect to experience and what Prieto can expect to experience differ significantly. . . . For conditions dictated by a prisoner's conviction and sentence are the conditions constituting the 'ordinary incidents of prison life' for that prisoner."). Then, with the baseline established, we determine whether the prison conditions impose atypical and substantial hardship in relation to that norm. See id. at 254 (holding that Prieto's death row confinement did not impose atypical and significant hardship in relation to the ordinary incidents of prison life).

a.

Normative Baseline for Atypicality

Although some of our sister circuits read our decision in Beverati to imply that the typical conditions in the general prison population provide the comparative baseline, see, e.g., Wilkerson v. Goodwin, 774 F.3d 845, 854 (5th Cir. 2014), Prieto held that the general prison population is not always the basis for comparison -- the "baseline for atypicality" may shift

22

depending on the "prisoner's conviction and sentence." Prieto, 780 F.3d at 253. Nonetheless, for the reasons explained below, we conclude that the general population is the baseline for atypicality for inmates who are sentenced to confinement in the general prison population and have been transferred to security detention while serving their sentence.

In Beverati, the general population was the baseline. There, inmates sentenced to the Maryland Penitentiary's general population were administratively segregated in solitary confinement because they possessed escape paraphernalia.[13] The inmates complained that Maryland prison officials deprived them of procedural due process. To determine whether "the conditions the prisoner[s] maintain[ed] [gave] rise to a liberty interest," we compared the inmates' living conditions to "those incident to normal prison life." Beverati, 120 F.3d at 503. Because "applicable prison regulations indicate[d] that the conditions in administrative segregation [we]re similar in most respects to those experienced by inmates in the general population," we concluded that the inmates did not possess a liberty interest in avoiding administrative segregation. Id.

---

[13] One of the Beverati inmates was originally placed in disciplinary detention, but he was transferred to administrative segregation after serving his disciplinary sentence. See 120 F.3d at 501-02.

But in Prieto, we held that using the general population to gauge the ordinary incidents of prison life for a death row inmate was improper. See 780 F.3d at 252-54. There, a Virginia inmate on death row claimed a liberty interest in avoiding the "undeniably severe" conditions of death row confinement. Id. at 252, 254. The district court interpreted Beverati to convey that "the Fourth Circuit uses a facility's 'general prison population' as the relevant baseline." Prieto v. Clarke, No. 1:12-cv-1199, 2013 WL 6019215, at *1 (E.D. Va. Nov. 12, 2013) (internal quotation marks omitted), rev'd, 780 F.3d 245 (4th Cir. 2015). The court determined that housing conditions on death row were atypical and significantly harsh compared to the general population and, therefore, gave rise to a liberty interest. We reversed. Because "Virginia law mandate[d] that all persons convicted of capital crimes are . . . automatically confined to death row," Prieto, 780 F.3d at 254, housing on death row was "normal prison life," Beverati, 120 F.3d at 503. Therefore, Prieto was unable to assert a liberty interest in avoiding confinement to death row. See Prieto, 780 F.3d at 253.

The "conditions dictated by a prisoner's conviction and sentence," we stated, "are the conditions constituting the 'ordinary incidents of prison life' for that prisoner." Prieto, 780 F.3d at 254 (emphasis supplied) (quoting Sandin, 515 U.S. at

24

484); accord Rezaq v. Nalley, 677 F.3d 1001, 1013 (10th Cir. 2012) ("The ordinary incidents of prison life will differ depending on a particular inmate's conviction . . . ." (internal quotation marks omitted)). Although the "nature of a[n inmate's] conviction" and the "length of [his] sentence" do not "give rise to different liberty interests," "state law mandates [regarding] the confinement conditions to be imposed on offenders convicted of a certain crime and receiving a certain sentence . . . are, by definition, the ordinary incidents of prison life for such offenders." Prieto, 780 F.3d at 254 (internal quotation marks omitted). A death row inmate's confinement conditions must fall within the "'expected perimeters'" of his death row sentence. Id. (emphasis omitted) (quoting Sandin, 515 U.S. at 485). Likewise, a general population inmate's confinement expectations radiate from the conditions that inmates in the general population normally experience. See id. at 253-54 ("What the inmates in Beverati could expect to experience and what Prieto can expect to experience differ significantly. It should come as no surprise that the baseline does, too.").

Although the general prison population is not the relevant atypicality baseline in all cases, it is the touchstone in cases where the inmate asserting a liberty interest was sentenced to confinement in the general population and later

transferred to security detention.[14]   See Prieto, 780 F.3d at
252.   This view comports with Supreme Court opinions as well as
our precedent.   See Wilkinson, 545 U.S. at 223 ("Sandin found no
liberty interest protecting against a 30-day assignment to
segregated confinement because it did not present a dramatic
departure from the basic conditions of the [inmate's sentence]."
(alteration in original) (internal quotation marks omitted));
Prieto, 780 F.3d at 254 ("Prieto, like any other inmate, can
only be deprived of that to which he is entitled." (emphasis in
original)); Beverati, 120 F.3d at 501, 503; Gaston v. Taylor,
946 F.2d 340, 343 (4th. 1991) ("[P]unishment or confinement
beyond that contemplated by the original sentence imposed can be
imposed only with procedures satisfying due process.").

Because it is uncontroverted that Appellant was
sentenced to the general population, the general population is
the basis for our comparison here.

---

[14] We previously took this approach in Walsh v. Corcoran,
No. 98-7853, 2000 WL 328019, at *7 (4th Cir. Mar. 29, 2000)
(unpublished) ("[I]n Beverati, our determination that
administrative segregation did not present an atypical or
significant hardship involved using the incidents of prison life
that flowed from the inmates' original sentences as a baseline
for comparison with conditions in administrative segregation.").

26

b.

<u>Atypical and Significant Hardship</u>

Having identified the general population as the atypicality baseline, we turn to whether Appellant has met his burden of proof. Appellant must demonstrate his solitary confinement in security detention constitutes atypical and significant hardship in relation to the general population. See <u>Sandin</u>, 515 U.S. at 483; <u>Prieto</u>, 780 F.3d at 251 (placing burden of proof on the inmate).

i.

To understand which confinement conditions are atypical and significant in comparison to the general population, we turn to <u>Beverati</u> and <u>Wilkinson</u>.

The <u>Beverati</u> inmates complained that the conditions of their six-month administrative segregation amounted to atypical and significant hardship. See <u>Beverati</u>, 120 F.3d at 503-04. Prison regulations specified that although inmates on administrative segregation were confined to solitary cells, they were permitted at least one hour of recreation outside their cells seven days per week, just as the general population inmates were. See <u>id.</u> at 504. The inmates in administrative segregation also had substantially the same access to prison services and educational programming as the general population.

See id. at 503. Nevertheless, the inmates alleged that these regulations were not being enforced and that, in fact, the inmates in administrative segregation experienced more onerous conditions. See id. at 504. We credited the inmates' assertions but noted, "[t]he applicable prison regulations indicate[d] that the conditions in administrative segregation [we]re similar in most respects to those experienced by inmates in the general population." Id. at 503. Although the inmates offered evidence that conditions in administrative segregation were more burdensome "than those imposed on the general prison population," we concluded these conditions "were not so atypical that exposure to them for six months" implicated a liberty interest. Id. at 504.

Eight years after Beverati, the Supreme Court further illuminated the atypicality standard in Wilkinson. The Wilkinson petitioners were assigned to Ohio's supermax facility based on the prison's evaluation of the security risk they posed. A unanimous Court held that incarceration in a supermax facility implicated liberty interests. See Wilkinson, 545 U.S. at 224.

The Court emphasized three factors in its analysis: (1) the magnitude of confinement restrictions; (2) whether the administrative segregation is for an indefinite period; and (3) whether assignment to administrative segregation had any

28

collateral consequences on the inmate's sentence. As for the first factor, the Court found that incarceration in Supermax was "synonymous with extreme isolation"; "every aspect of an inmate's life [was] controlled and monitored"; inmates were "deprived of almost any environmental or sensory stimuli and of almost all human contact"; and exercise was permitted only indoors for one hour per day. Id. 214. Second, because inmates were confined to a supermax facility for an indefinite period, their interest in receiving meaningful procedural review was magnified. See id. at 224 ("Unlike the 30-day placement in Sandin, placement [in Supermax] is indefinite . . . ."). And third, assignment to Supermax "disqualifie[d] an otherwise eligible inmate for parole consideration." Id. The Court concluded that, "[w]hile any of these conditions standing alone might not be sufficient to create a liberty interest, taken together they impose an atypical and significant hardship within the correctional context." Id.

Notably, the Wilkinson Court did not engage in a point-by-point comparison of the conditions that inmates experienced in a supermax facility with the ordinary incidents of prison life. Nor did it determine whether the applicable baseline was the general population or any another segregation unit. Instead, the Court concluded that incarceration in the Supermax environment was so atypical and significant that it

29

would give rise to a liberty interest "under any plausible baseline." Id. at 223.

ii.

In the case at hand, the district court held Appellant had no liberty interest, reasoning that "[m]ost of the conditions alleged [we]re nothing more than the usual aspects of a solitary confinement facility"; "besides the length of his confinement . . . [Appellant] ha[d] not alleged living conditions nearly as bad as those present in Beverati"; and in any case, Appellant was "subject to substantially more favorable conditions than the inmates in Wilkinson." Incumaa v. Stirling, No. 9:12-cv-03493, 2014 WL 958679, at *9-10 (D.S.C. Mar. 11, 2014) (internal quotation marks omitted). The court further reasoned:

> Even though Beverati predates Wilkinson, at the very least it suggests that the bar for proving an atypical and significant hardship is quite high in the Fourth Circuit. Additionally, even since Wilkinson the Fourth Circuit has cited Beverati in rejecting the notion that inmates enjoy a protected liberty interest in avoiding confinement in administrative segregation, United States v. Daniels, 222 F. App'x 341, 342 n.* (4th Cir. 2007) (unpublished) (per curiam) ("Extended stays on administrative segregation . . . do not ordinarily implicate a protected liberty interest." (citing Beverati, 120 F.3d at 502)), and courts in this district have relied on Beverati in procedural due process cases involving administrative segregation.

30

Id. at *9 n.4 (citation omitted).

The district court was also persuaded by its belief that Appellant's stay in the SMU was not indefinite because the "[Department's] renunciation procedure puts the duration of his confinement into his own hands to a significant degree." Incumaa, 2014 WL 958679, at *10. This, the court stated, distinguished the present circumstances from those in Wilkinson. See id. The court also relied on the fact that, in contrast with the Wilkinson inmates' assignment to Supermax, Appellant's transfer to the SMU had no effect on his parole eligibility because Appellant was already disqualified from this privilege as a result of his sentence to life imprisonment without the possibility of parole. The district court was incorrect on two fronts.

The district court misapplied Beverati and Wilkinson. Beverati does not signal that "the bar for proving an atypical and significant hardship is quite high in the Fourth Circuit." Incumaa, 2014 WL 958679 at *9 n.4. The bar in our circuit is neither higher nor lower than that of the Supreme Court. Rather, Beverati simply highlights a failure of proof. The Beverati inmates failed to meet their burden because the evidence showed that administrative segregation was not significantly worse than confinement in the general population.

31

The district court's conclusion that Appellant had no liberty interest in avoiding the onerous conditions of his confinement was also erroneous. Appellant offered evidence demonstrating that conditions in the SMU are significantly worse than in the general population and that the severity, duration, and indefiniteness of his confinement implicate the concerns the Supreme Court identified in Wilkinson. See Wilkerson, 774 F.3d at 854 (collecting cases that "considered the severity of the restrictive conditions and their duration as key factors" in the liberty interest analysis).

First, Appellant demonstrated that his confinement conditions were severe. He provided uncontested evidence describing the severely restrictive and socially isolating environment of the SMU in contrast to the general population -- the near-daily cavity and strip searches; the confinement to a small cell for all sleeping and waking hours, aside from ten hours of activity outside the cell per month; the inability to socialize with other inmates; and the denial of educational, vocational, and therapy programs.

In many respects, the circumstances of Appellant's incarceration in the SMU mirror the experience of the Wilkinson inmates in Ohio's Supermax facility. It may, in fact, be worse in some respects: unlike the Wilkinson inmates, Appellant is subject to a highly intrusive strip search every time he leaves

32

his cell.  And, the Beverati inmates did not allege that they were socially isolated to a similar degree.

Second, similar to the Wilkinson inmates' confinement in a supermax facility, Appellant's confinement to the SMU is extraordinary in its duration and indefiniteness.  See Wilkerson, 774 F.3d at 855 (concluding that inmate's 39-year indefinite solitary confinement was atypical and significant). The district court relied on an unpublished opinion that stated, "[e]xtended stays on administrative segregation . . . do not ordinarily implicate a protected liberty interest."  United States v. Daniels, 222 F. App'x 341, 342 n.* (4th Cir. 2007). But Daniels has no precedential weight, and it did not consider an exceptional 20-year stint in highly restrictive solitary confinement, as we do here.[15]  Furthermore, the district court wrongly concluded that Appellant's stay in the SMU, although not limited to a particular number of days, was not "indefinite" because Appellant could secure release by renouncing his affiliation with the Five Percenters.  As we explained above,

---

[15] In fact, it is not clear that Daniels had been administratively segregated at all -- his interlocutory appeal pending sentencing was dismissed for lack of jurisdiction.  See Daniels, 222 F. App'x at 342 ("The order Daniels seeks to appeal is neither a final order nor an appealable interlocutory or collateral order.  Accordingly, we dismiss the appeal for lack of jurisdiction.").

renunciation does not guarantee release to the general population.

Appellant was already ineligible for parole by virtue of his sentence before he was transferred to the SMU, and therefore his confinement does not implicate the third concern identified in Wilkinson. But that fact, in itself, does not undermine the "material and substantial similarities" that this case bears to Wilkinson. Wilkerson, 774 F.3d at 855 (finding liberty interest pursuant to Wilkinson where inmate was administratively segregated indefinitely in highly restrictive solitary confinement conditions for nearly 39 years, even though segregation did not affect the inmate's parole eligibility).

Therefore, Appellant has demonstrated a liberty interest in avoiding solitary confinement in security detention.

2.

The Process Due

Because the district court determined Appellant had no liberty interest in avoiding the SMU as a matter of law, it did not address whether the Department's review of Appellant's ongoing confinement in the SMU satisfied procedural due process standards. Because we hold otherwise, we now address whether the Department's process meets minimum due process standards. We conclude that there remains a triable dispute as to whether the Department afforded Appellant a meaningful opportunity to

34

understand and contest its reasons for holding him in solitary confinement for the past 20 years.

a.

Particularly in the prison context, "the requirements of due process are flexible and [call] for such procedural protections as the particular situation demands." Wilkinson, 545 U.S. at 224 (alteration in original) (internal quotation marks omitted). To determine whether procedural protections are sufficient to protect an inmate's liberty interests, we look to Mathews v. Eldridge's three factor test:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

424 U.S. 319, 335 (1976); see also Wilkinson, 545 U.S. at 224 (applying these factors).

In Wilkinson, the Supreme Court examined the procedure that Ohio prisons employed to review an inmate's confinement to the Supermax unit. Ohio's procedural mechanism was a complex and comprehensive three-tier process that afforded inmates notice of the basis for the prison's transfer decision and provided them an opportunity to contest the decision on at least

35

two occasions. See 545 U.S. at 215-17, 227. And the inmate's administrative segregation was reviewed pursuant to this three-tiered process at least once every year. See id. at 217. Applying the Mathews factors, the Court held that Ohio's process was sufficient to protect the inmates' rights. See id. at 228-29.

Regarding the first factor, the Wilkinson Court noted that the inmates' private liberty interests must be "evaluated . . . within the context of the prison system and its attendant curtailment of liberties" because "[p]risoners held in lawful confinement have their liberty curtailed by definition [and] the procedural protections to which they are entitled are more limited." Wilkinson, 545 U.S. at 225.

The second factor -- the risk of erroneous deprivation -- favored the prison in Wilkinson because its review process was comprehensive and multi-layered:

> The . . . [p]olicy provides that an inmate must receive notice of the factual basis leading to consideration for [Supermax] placement and a fair opportunity for rebuttal. Our procedural due process cases have consistently observed that these are among the most important procedural mechanisms for purposes of avoiding erroneous deprivations. Requiring officials to provide a brief summary of the factual basis for the classification review and allowing the inmate a rebuttal opportunity safeguards against the inmate's being mistaken for another or singled out for insufficient reason. In addition to having

36

> the opportunity to be heard at the Committee stage, Ohio also invites the inmate to submit objections prior to the final level of review. This second opportunity further reduces the possibility of an erroneous deprivation.
>
> . . . .
>
> If the recommendation is [Supermax] placement, Ohio requires that the decisionmaker provide a short statement of reasons. This requirement guards against arbitrary decisionmaking while also providing the inmate a basis for objection before the next decisionmaker or in a subsequent classification review. The statement also serves as a guide for future behavior.

Wilkinson, 545 U.S. at 225-26 (citations omitted).

As to the third factor, concerning the state's interests, the Court concluded that the value of some aspects of a traditional adversarial hearing -- particularly the right to call witnesses -- was "doubtful in comparison to" the danger they posed. Wilkinson, 545 U.S. at 228. The Wilkinson Court encouraged courts to consult the "informal, nonadversary procedures" discussed in Hewitt v. Helms, 459 U.S. 460, 476 (1983), which were adequate to protect the prison's interests in security and order. Wilkinson, 545 U.S. at 229. In Hewitt, the Supreme Court held that a nonadversarial process may be sufficient so long as it provides "some notice of the charges against [the inmate] and an opportunity to present his views to

37

the prison official charged with deciding whether to transfer him to administrative segregation."  495 U.S. at 476.

b.

Applying the <u>Mathews</u> factors, we conclude Appellant has demonstrated a triable dispute on his procedural due process claim.  The record, viewed in the light most favorable to Appellant, supports Appellant's assertion that the Department's review process is inadequate and fails to honor the basic values of procedural due process.  This record, bereft of any evidence that Appellant has ever received meaningful review, stands in contrast to <u>Wilkinson</u> and falls short of satisfying <u>Hewitt</u>.

i.

Because Appellant has already been held in solitary confinement for 20 years, he has a significant private interest in leaving the restrictive conditions in the SMU and serving some part of his remaining life sentence outside of solitary confinement.  Appellant's private interest in this case, even if "evaluated . . . within the context of the prison system and its attendant curtailment of liberties," is clear.  <u>Wilkinson</u>, 545 U.S. at 225.  Prolonged solitary confinement exacts a heavy psychological toll that often continues to plague an inmate's mind even after he is resocialized.  <u>See</u> <u>Davis v. Ayala</u>, 576 U.S. ___, No. 13-1428, slip op. at 3-4 (June 18, 2015) (Kennedy, J., concurring) (noting that inmates are brought "to the edge of

38

madness, perhaps to madness itself" by "[y]ears on end of near-total isolation" (internal quotation marks omitted)). Although it is quite likely that Appellant is already suffering the effects of his two decades of solitude, he has an interest in attempting to reverse or ameliorate that harm. Appellant's private interest stems not only from his prolonged isolation. Indeed, in the SMU, every aspect of Appellant's life is severely restricted and his body is subjected to extraordinary intrusion on a regular basis. United States v. Charters, 829 F.2d 479, 491 (4th Cir. 1987) ("The right to be free of unwanted physical invasions has been recognized as an integral part of the individual's constitutional freedoms . . . ."). Finally, Supreme Court has made clear that Appellant is entitled to periodic review: "administrative segregation may not be used as a pretext for indefinite confinement of an inmate. Prison officials must engage in some sort of periodic review of the confinement of such inmates." Hewitt, 459 U.S. at 477 n.9; see also Wilkerson, 774 F.3d at 856 (looking disfavorably upon a prison's "rote repetition" of the original justification for placing a prisoner in segregation to support continued confinement, which rendered "his solitary confinement . . . effectively indefinite" (internal quotation marks omitted)).

ii.

The risk of erroneous deprivation is also exceedingly high in this case for at least three reasons. First, the Department has only a single-layered confinement review. According to Department regulations, the ICC makes the sole decision on which inmates are candidates for release. The warden does not participate in the decision to release an inmate unless the inmate files a grievance against the ICC's decision to continue detention. This stands in contrast to the multi-layered procedural mechanism described by the Wilkinson Court. See Wilkinson, 545 U.S. at 226-27.

Second, the Department regulations do not require the ICC to furnish a factual basis for its decisions. Instead, it need only "provide the inmate with a copy of its recommendation." J.A. 139. Moreover, in practice, the Department's process apparently only requires the ICC to give a perfunctory explanation supporting its decision to continue to hold Appellant in solitary confinement. The ICC has merely rubber-stamped Appellant's incarceration in the SMU (figuratively and sometimes literally), listing in "rote repetition" the same justification every 30 days. Wilkerson, 774 F.3d at 856 (internal quotation marks omitted). The policy encourages "arbitrary decisionmaking" and risks the possibility that the ICC may single out Appellant "for an insufficient

reason." Wilkinson, 545 U.S. at 226. Indeed, the ICC's ongoing classification of Appellant is especially wanting for explanation in light of his nearly perfect disciplinary record while in security detention.

Third, the Department regulations do not grant Appellant the right to contest the factual bases for his detention before the ICC makes its decision -- either with respect to his assigned behavior level or his candidacy for release. The regulations merely provide, "[t]he inmate may be present for the advancement/release review if security staffing allows." J.A. 138 (emphasis supplied). The fact that the ICC is not required to provide a factual basis for its decision further increases the "possibility of an erroneous deprivation" because Appellant has no "basis for objection" to support his grievance against the ICC's decision. Wilkinson, 545 U.S. at 226.

Appellee nonetheless argues that its review process "meets the flexible due process standard" approved in Wilkinson because, compared to inmates confined in Ohio's Supermax facility, "Appellant's custody is reviewed much more frequently" -- that is, every 30 days as opposed to once a year. Appellee's Br. 39. However, in view of Appellant's uncontested evidence demonstrating the inadequacy of the Department's confinement review, this argument falls flat.

41

iii.

The third Mathews factor -- state interest -- accounts for the Department's need to maintain order and security in South Carolina's prisons. But as the Supreme Court noted in Wilkinson and Hewitt, the prison's interest does not eclipse Appellant's well-established right to receive notice of the grounds for his ongoing confinement and to present his rebuttal to those grounds.

We do not decide whether prison review mechanisms must be as extensive as in Wilkinson in order to pass constitutional muster. On the facts presented in this case, however, we conclude that the record establishes a triable question of whether the Department's review process was adequate to protect Appellant's right to procedural due process.

IV.

The district court's order of summary judgment is affirmed as to Appellant's RLUIPA claim and reversed as to his procedural due process claim. We affirm the district court's holding with respect to Appellant's RLUIPA claim because he has failed to show that his religious beliefs, rather than his choice to participate in a riot, are the proximate cause of his continued solitary confinement. We reverse the district court's order on Appellant's procedural due process claim because Appellant has demonstrated a liberty interest in avoiding

42

solitary confinement and Appellee has not proven as a matter of law that it provided Appellant meaningful review.  We remand this case for further proceedings consistent with this opinion.

<u>AFFIRMED IN PART, REVERSED IN PART,</u>
<u>AND REMANDED FOR FURTHER PROCEEDINGS</u>